932 P.2d 907

**STATE of Idaho, Plaintiff–Respondent–Cross Appellant,**

v.

**William L. GRAY, Defendant–Appellant–Cross Respondent.**

No. 21030.

Court of Appeals of Idaho.

Jan. 2, 1997.

Petition for Review Denied
March 19, 1997.

Weinpel, Woolf & Combo, Idaho Falls, and Grant & Newcomb, Laramie, WY, for appellant.

Alan G. Lance, Attorney General; Lynn E. Thomas, Deputy Attorney General, Boise, for respondent.

PERRY, Judge.

William L. Gray was found guilty by a jury of two counts of first degree murder, I.C. § 18–4003, and one count of first degree burglary, I.C. §§ 18–1401, –1403. On appeal, Gray alleges multiple errors by the district court and by his trial counsel and seeks reversal of his judgments of conviction. The state cross-appeals, claiming that the district court relied upon inappropriate factors in sentencing. We affirm.

## I.

### FACTS AND PROCEDURE

In the early morning hours of July 24, 1989, Gray's wife, Betty Gray, and her friend, Reeda Roundy, were killed in Roundy's house in Idaho Falls. In 1992 Gray was indicted for two counts of first degree murder and one count of first degree burglary.

On May 11, 1993, Gray went to trial before a jury. The prosecution argued that Gray killed Betty because he was aware that she was having an affair. The prosecution further alleged that, to prevent his motive for her murder from being discovered, Gray had asked Betty not to discuss their impending divorce with their family and friends. The prosecution contended that Gray had purchased an International Travelall vehicle, which he registered in someone else's name, with the intent to avoid use of his usual vehicle and thereby conceal his presence at the scene of the crime. The prosecution attempted to prove that Gray drove the Travelall from the Grays' home in Jackson Hole, Wyoming, to the Eastern Idaho Regional Medical Center in Idaho Falls on an evening when Betty was staying overnight with Roundy. Gray allegedly then rode a bicycle approximately three and a half miles to Roundy's house. The prosecution's theory continued that Gray killed both women and set the scene in the house to appear as though the killings were committed as part of a satanic ritual. After the killings, Gray then rode the bicycle back to the hospital.

The defense alleged that Gray was unaware at the time of Betty's death that she was having an affair. Gray contended that he could not have ridden a bicycle for seven miles due to his poor health. He also asserted that one of three other men associated

with the two victims was responsible for the murders.

Following trial, the jury returned a verdict of guilty on two counts of first degree murder and one count of first degree burglary, with each of the crimes being enhanced for the use of a firearm. Gray was sentenced to two determinate life sentences for first degree murder and ten years, with a minimum period of incarceration of five years, for first degree burglary.

## II.

## ANALYSIS

### A. Hearsay Statements

Gray filed a motion in limine seeking to exclude hearsay statements made by Betty regarding her husband, their marriage, their impending divorce and her affair. The district court granted Gray's motion in part and denied it in part.

■ The trial court has broad discretion in deciding whether to admit hearsay under one of the many exceptions to the general rule that hearsay is inadmissible. This Court will not overturn the exercise of that discretion absent a clear showing of abuse. *State v. Zimmerman,* 121 Idaho 971, 974, 829 P.2d 861, 864 (1992). *See also Dept. of Health and Welfare v. Altman,* 122 Idaho 1004, 1007, 842 P.2d 683, 686 (1992). When a trial court's discretionary decision in a criminal case is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine: (1) whether the lower court correctly perceived the issue as one of discretion; (2) whether the lower court acted within the boundaries of such discretion and consistently with any legal standards applicable to the specific choices before it; and (3) whether the court reached its decision by an exercise of reason. *State v. Hedger,* 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989). In order to mandate a reversal, it must be shown that the objectionable evidence contributed to the

verdict and thereby affected the substantial rights of the defendant. *State v. Cliff,* 116 Idaho 921, 924, 782 P.2d 44, 47 (Ct.App.1989).

### 1. Betty's statements

#### (a) I.R.E. 803(24) hearsay exception and Confrontation Clause

Among the statements reviewed by the district court prior to trial were three statements which the district court admitted pursuant to I.R.E. 803(24).[1] Gray contends on appeal that the district court erred in admitting these statements and that their admission violated his rights pursuant to the Confrontation Clause of the United States Constitution.

■ The first inquiry must be whether the statements were hearsay, that is, whether they were out-of-court statements offered as an assertion of proof of the matters asserted therein. *State v. Gomez,* 126 Idaho 700, 704, 889 P.2d 729, 733 (Ct.App.1994). *See also Isaacson v. Obendorf,* 99 Idaho 304, 309, 581 P.2d 350, 355 (1978). Hearsay is made generally inadmissible by I.R.E. 802. *Gomez,* 126 Idaho at 704, 889 P.2d at 733. However, if the statements were hearsay, the next inquiry is whether they were admissible under an exception to the hearsay rule.

Idaho Rule of Evidence 803(24) creates an exception to the inadmissible hearsay rule for:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

---

1. Statement C—Betty told JoAnn Buccola, her sister, and Janis Roby that Gray wanted to keep the divorce a secret. Statement F—Betty told Buccola that Gray was angry with her: (1) after Gray steamed open a letter to her mother which discussed the divorce; and (2) for telling Buccola about the divorce. Statement G—Betty stated to Buccola that she believed Gray knew of her affair with LeRoy Leavitt because she found a card from Leavitt on the floor of her bedroom closet after she had previously hidden the card, with others, in the closet.

The district court examined statements identified as C, F and G and determined that they were being offered to prove the truth of the matters asserted therein and were, therefore, hearsay. The district court further determined that each statement was relevant to a material fact, was more probative than other evidence available to the prosecution, and its admission would promote the interests of justice. The district court reviewed each statement, found circumstantial guarantees of trustworthiness and, through the use of reason and application of the appropriate legal standards, deemed the evidence admissible. *See Hedger,* 115 Idaho at 600, 768 P.2d at 1333. The district court did not abuse its discretion in finding these statements admissible pursuant to I.R.E. 803(24).

■ Once a statement is determined to be hearsay, even if it is found to be admissible due to an exception to the hearsay rule, a criminal defendant's rights pursuant to the Confrontation Clause of the Sixth Amendment of the United States Constitution must be addressed. In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the United States Supreme Court set forth an approach for determining when incriminating statements, admissible under an exception to the hearsay rule, also meet the requirements of the Confrontation Clause. A statement of a declarant, who will not be a witness at trial, is admissible only if the prosecution establishes that the declarant is unavailable and if the statement bears adequate indicia of reliability. If the statement falls within a firmly rooted hearsay exception, reliability can be inferred. If, however, the statement does not fit within a firmly rooted hearsay exception, the statement is presumed inadmissible, and that presumption can only be overcome by a showing of particularized guarantees of trustworthiness. *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539.

Idaho Rule of Evidence 803(24) has been specifically addressed by the United States Supreme Court in relation to the Confrontation Clause. In *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), the Supreme Court determined that I.R.E. 803(24) is not a well-rooted exception to the

hearsay rule and that hearsay admitted pursuant to that section must be proven to have particularized guarantees of trustworthiness. The Supreme Court noted the spontaneity of the statement, the consistency of repetition, the mental state of the declarant and the lack of motive to fabricate as indicators of trustworthiness. *Wright,* 497 U.S. at 821–22, 110 S.Ct. at 3149–50. The Supreme Court further stated that these factors are not exclusive, and the courts have considerable leeway to consider other appropriate factors. *Id.* at 822, 110 S.Ct. at 3150. The trustworthiness must, however, be shown from the totality of the circumstances that surround the making of the statement. *Id.* at 819, 110 S.Ct. at 3148–49. The existence of corroborating evidence may indicate that any error in the admission of a statement was harmless, but is not an appropriate consideration in finding a statement was trustworthy. *Id.* at 823, 110 S.Ct. at 3150–51; *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986).

In this case, the district court determined that the context in which the statements were made provided guarantees of trustworthiness sufficient to assuage concerns regarding reliability and prevented a violation of the Confrontation Clause. *See State v. Giles,* 115 Idaho 984, 987, 772 P.2d 191, 194 (1989). The district court found that statement C was made spontaneously, was repeated to two individuals and was made without a motive for fabrication. The district court further determined that when Betty made statement F she did so spontaneously; she repeated the statement to two individuals; and she was apprehensive and nervous at the time that she made the statement. Finally, the district court found that statement G was made without a motive for fabrication and was made spontaneously. Based on these findings, and the record regarding these statements, we affirm the district court's admission of statements C, F and G pursuant to I.R.E. 803(24).

**(b) State of mind exception**

■ In addition to the hearsay statements admitted under I.R.E. 803(24), the district court also admitted statements made by Bet-

ty prior to her death pursuant to I.R.E. 803(3). During a hearing on Gray's motion in limine, JoAnn Buccola, Betty's sister, testified that, prior to her death, Betty made certain statements to her which were identified by the district court as statements B.[2] The district court deemed Betty's statement that she was having an affair with Leavitt a statement of fact, and therefore, not within the state of mind exception to the hearsay rule. The district court ruled that this statement was inadmissible. The remaining statements designated as B were deemed to fall within the I.R.E. 803(3) hearsay exception as expressions of the declarant's state of mind. The district court ruled, however, that they were only to be admitted if the defense first made them relevant by claiming that Betty and William Gray were happily married. Gray argues that the statements were admitted in error.

At trial, Gray's defense counsel inquired into the happiness of the Gray marriage while questioning the Grays' son, Jeff. Gray placed the happiness of his marriage at issue through cross-examination of a witness for the state. Betty's state of mind regarding her marriage thereby became relevant to Gray's defense against the charges. Gray argues, on appeal, that these statements did not bear "particularized guarantees of trustworthiness." However, the district court did not admit the statements under I.R.E. 803(24), which requires such a showing of trustworthiness. Instead, the district court admitted the statements under the firmly rooted hearsay exception I.R.E. 803(3). *See Terrovona v. Kincheloe*, 852 F.2d 424, 427 (9th Cir.1988). Hence, the district court's admission of statements reflecting Betty's state of mind was proper.

**(c) Statements found inadmissible**

■ In addition to the statements which the district court reviewed prior to trial and found admissible, the district court also reviewed statements H, I and J,[3] which were held to be inadmissible. Gray claims Buccola's statement, that the "doctors had told him that he should start doing mild exercises and walking," was admitted in violation of the district court's grant of the motion in limine as to statement I. However, the statement admitted at trial does not contain the elements of Gray's abuse of his kidney or his refusal to perform the exercises. Hence, the district court's order regarding statement I was not violated.

Gray did not object to the remaining testimony which he now claims was admitted in violation of the pretrial order. Statement J, which had been deemed inadmissible in the decision on Gray's motion in limine, came into evidence for the first time upon Gray's questioning of Buccola. During direct examination, Buccola mentioned that Gray "was looking at telephone bills and she did not want him to see my number on the phone bill," in violation of the district court's order in limine on this issue. Gray elicited the same statement from Buccola during cross-examination.

■ The denial of a motion in limine generally preserves an issue for appeal. *State v. Babb*, 125 Idaho 934, 940, 877 P.2d 905, 911 (1994); *State v. Higgins*, 122 Idaho 590, 596, 836 P.2d 536, 542 (1992); *State v. Wood*, 126 Idaho 241, 243, 880 P.2d 771, 773 (Ct.App.1994); *Davidson v. Beco Corp.*, 112 Idaho 560, 564, 733 P.2d 781, 785 (Ct.App. 1986), *rev'd on other grounds*, 114 Idaho 107, 753 P.2d 1253 (1987).[4] When the district

**2.** Statement B—Betty stated that she was having an affair with Leavitt. She further stated that she intended to divorce Gray, that she planned to marry Leavitt and that she intended to meet with Leavitt on the day that she was killed.

**3.** Statement H—Betty stated that Gray was looking over their telephone bills and checking the outgoing telephone numbers. Statement I—Betty said that she decided to divorce Gray because she had talked to his doctor; his doctor was upset because Gray was abusing a good kidney that he had received by transplant; and he was

not doing mild walking exercises or riding an exercise bike as prescribed by the doctor. Statement J—Betty told Buccola that Gray was extremely angry and blamed Buccola for the impending divorce.

**4.** The Idaho Supreme Court explicitly adopted the holding in *Davidson* that a denial of a motion in limine preserves the issue for appeal stating, "we continue to adhere to the holding in *Davidson v. Beco Corp., supra*, that if the motion *in limine* is made, and the trial court unqualifiedly rules on the admissibility or inadmissibility of the

court defers ruling on an evidentiary objection made in a motion in limine, the objection must be continued at trial. *State v. Hester*, 114 Idaho 688, 700, 760 P.2d 27, 39 (1988). Here, prior to trial, the district court granted the motion in limine as to statements H, I and J on the basis that the statements had not, at that time, been shown to be relevant. In such a situation we conclude that the litigant who has made a motion in limine requesting an advance ruling on the admissibility of evidence must continue to assert an objection as the evidence is offered or the objection is not preserved. *Hester*, 114 Idaho at 700, 760 P.2d at 39. Gray has failed to preserve his right to appeal the statements which were ruled inadmissible but were testified to without objection by Gray.

Even where a pretrial motion preserves an evidentiary objection for appeal, the defense may waive the objection during trial. *Davidson*, 112 Idaho at 564, 733 P.2d at 785. If the evidentiary challenge on appeal is not the same as that presented in the motion in limine and no objection during trial raised the specific basis, then that issue was not preserved for appeal. *Babb*, 125 Idaho at 940, 877 P.2d at 911; *Higgins*, 122 Idaho at 596, 836 P.2d at 542. Statements H and J were introduced through Gray's cross-examination of the witness. Agreeing to the admission of evidence which was previously deemed inadmissible is a waiver of the prior objection. *Davidson*, 112 Idaho at 564, 733 P.2d at 785. We conclude that eliciting the evidence similarly waives the prior objection. Statement I was not admitted at trial. Gray failed to preserve his appeal as to issues H and J and further waived his earlier objection by introducing the evidence in question. Gray has failed to establish a basis for relief on this issue.

### 2. Reeda Roundy's statements

Gray appeals from the district court's order excluding statements by Roundy that she was fearful of her ex-boyfriend, that he was a mercenary, that he followed her around and repeatedly telephoned her, and that he had threatened to kill her. The district court excluded these statements on the basis that they were hearsay not admissible within an exception to the hearsay rule.

As noted above, the first inquiry must be whether the statements were hearsay, that is, whether they were out-of-court statements offered as an assertion of proof of the matters asserted therein. *Isaacson*, 99 Idaho at 309, 581 P.2d at 355. The statements were offered by the defense for the truth of the matters asserted to erode the prosecution's allegation that Gray killed Roundy and Betty. The statements consisted of factual assertions regarding Roundy's ex-boyfriend's occupation as a mercenary and his threats and repeated telephone calls. The statements also included Roundy's comments that she feared that her ex-boyfriend would harm her and that if anything happened to her, the police should be informed of her fears. The statements were offered to prove the truth of the matters asserted therein, hence they were hearsay. Gray contends that the statements, although hearsay, were admissible under I.R.E. 803(3) and (24).

The district court determined that Roundy's fear of a person not related to the prosecution was irrelevant. We review questions of relevancy de novo. *State v. Raudebaugh*, 124 Idaho 758, 764, 864 P.2d 596, 602 (1993). Relevant evidence is that which has

> [A]ny tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

I.R.E. 401; *State v. Hocker*, 115 Idaho 544, 547, 768 P.2d 807, 810 (Ct.App.1989).

A victim's fear of an individual is relevant in only limited circumstances. *See* John W. Strong, McCORMICK ON EVIDENCE § 276, at 244 (4th ed. 1992). Purposes for which such statements are relevant include: establishment of a motive for the crime charged, *State v. Charboneau*, 116 Idaho 129, 143, 774 P.2d 299, 313 (1989); rebuttal of a claim of self-defense, suicide, or

---

evidence prior to trial, no further objection at trial is required in order to preserve the issue for

appeal." *State v. Hester*, 114 Idaho 688, 700, 760 P.2d 27, 39 (1988).

accidental death by illustrating the victim's propensity for or away from the relevant tendencies, *United States v. Brown*, 490 F.2d 758, 767 (D.C.Cir.1973); or to dispel the argument that victim and the accused had a good relationship, *United States v. Tokars*, 95 F.3d 1520, 1535 (11th Cir.1996). In each instance, the state of mind of the victim was integral in understanding a significant issue in the case. Here, the individual whose state of mind was relevant to Gray's defense was not Roundy, but rather her ex-boyfriend. Roundy's statements that she feared her ex-boyfriend do not show that he possessed an intent to harm her. Therefore, the statements do not bear on a material issue at trial in the same manner as those statements of fear which have been found to be admissible as descriptions of an existing mental state. Roundy's fear of a third person does not establish or disprove Gray's guilt. Roundy's statements regarding her concern about her ex-boyfriend are inadmissible because they fail to meet the test for relevancy.

 The statements regarding Roundy's ex-boyfriend's occupation and behavior do not fall within I.R.E. 803(3) because they do not describe a then-existing mental, emotional or physical condition. I.R.E. 803(3). The district court also considered I.R.E. 803(24) as an alternate theory of admissibility. As discussed earlier, I.R.E. 803(24) requires that the trustworthiness of the statement must be shown from the totality of the circumstances that surround the making of the statement. *Wright*, 497 U.S. at 819, 110 S.Ct. at 3148–49. In seeking the admission of the evidence at trial, Gray's counsel presented to the district court the content of the statements. Defense counsel did not provide an offer of proof which indicated the circumstances surrounding Roundy's declarations. The witnesses who allegedly heard Roundy's statements were not called upon to provide a situational background for the statements. Hence, there is no record of the circumstances surrounding the statements. We cannot say that Roundy's factual statements regarding her ex-boyfriend's behavior and occupation bore the circumstantial guarantees of trustworthiness which would have justified admission under I.R.E. 803(24). The record does not support the assertion

that the district court abused its discretion in excluding such evidence.

**B. Excluded Evidence of Roundy's Involvement in the Occult**

 On the night of the murders, eighteen red candles were burned in a circle on Roundy's countertop, and a satanic message was written on Roundy's countertop in blood. Gray attempted to introduce evidence that Roundy practiced tarot card reading and astrology. He averred that a nexus existed between the practices of tarot, astrology and satanism. Gray argued that the evidence of Roundy's involvement in such practices was admissible to explain the candles and message. Gray asserted that the tie to satanism may have led the jury to believe that someone involved in satanic practices with Roundy had committed the murders. The state argued that the practices of tarot card reading and astrology are not linked to satanism and, as such, Roundy's pastimes were irrelevant. The district court excluded the evidence as irrelevant. Gray argues on appeal that the exclusion of this evidence was error.

As noted above, appellate review of a trial court's finding of relevancy is de novo. *Raudebaugh*, 124 Idaho at 764, 864 P.2d at 602. In this case, the district court determined:

> Because there is no evidence that tarot and astrology are more likely to be practiced by satanists than by persons who are not satanists, evidence that Roundy practiced tarot and astrology is irrelevant. Accordingly, such evidence is not admissible under Rule 401, I.R.E.

We find the district court's analysis in this regard persuasive. In answer to the state's motion for exclusion, no evidence was presented supporting the notion that a tarot card reader or reader of astrology is more likely than other individuals to be involved in satanic practices. Hence, we affirm the district court's exclusion of evidence regarding Roundy's participation in tarot card reading and astrology.

**C. Photo Lineup**

Prior to trial, Gray sought to suppress the eyewitness identifications by three witnesses

for the prosecution. Patty Donbeck and Greg Black (a local police officer) reported seeing a man riding a bicycle between the murder scene and the Eastern Idaho Regional Medical Center in Idaho Falls on the night of the murders. Steve Mackley, a security guard for the hospital, was on duty that night and reported seeing a man ride a bicycle into the hospital parking lot and place it in a Travelall. The police showed these three individuals a photo lineup from which each chose Gray's photo as the man on the bicycle. Mackley later saw Gray at the hospital and again identified him, in person, as the individual from the parking lot on the night of the murders. The district court granted Gray's motion to suppress the identification by Donbeck and denied the motion as to Black and Mackley. Officer Black testified at trial that he was unsure if Gray was the individual he saw that night. Mackley testified regarding his prior identifications and also made an in-court identification of Gray as the man he had seen in the parking lot. Therefore, Gray only challenges the district court's refusal to suppress the identifications by Mackley. Gray argues that the photo lineup shown to Mackley was impermissibly suggestive and conducive to irreparable mistaken identity and that admission of Mackley's identification of Gray's photo therefore violated Gray's rights to due process. He further argues that the later identifications were tainted by the suggestive photo lineup and were, therefore, also inadmissible.

■ In applying constitutional standards to the facts found, our review of a claim of due process violation is one of free review. *State v. Weber*, 116 Idaho 449, 452, 776 P.2d 458, 461 (1989); *State v. Bell*, 119 Idaho 1015, 1017, 812 P.2d 322, 324 (Ct.App. 1991). An out-of-court identification must be suppressed if it was obtained as a result of procedures so unnecessarily suggestive that they are conducive to mistaken identification. *State v. Alger*, 115 Idaho 42, 44, 764 P.2d 119, 121 (Ct.App.1988). The due process test for suppression of an in-court identification that is allegedly tainted by an impermissibly suggestive out-of-court identification is whether the out-of-court identification was so suggestive that there is a very substantial likelihood of misidentification. *State v. Hoisington*, 104

Idaho 153, 161, 657 P.2d 17, 25 (1983). Hence, we will first review the out-of-court photo lineup identification. If the procedures surrounding Mackley's identification make it impermissibly suggestive, then admission of evidence regarding that identification was error. Further, if that identification was so flawed as to taint the later identifications which Mackley made in person, then those later identifications should also have been suppressed.

■ The suggestiveness of a photo lineup is to be determined by applying a totality of the circumstances test. *Id.* at 162, 657 P.2d at 26; *State v. Haggard*, 119 Idaho 664, 666, 809 P.2d 525, 527 (Ct.App.1991). If the identification was the result of suggestive procedures, the reliability of the identification must be reviewed. Where the reliability of the identification is sufficient to outweigh the corrupting effect of the suggestive identification, the admission of the identification testimony or evidence will not violate due process. *Manson v. Brathwaite*, 432 U.S. 98, 106, 97 S.Ct. 2243, 2249, 53 L.Ed.2d 140 (1977); *Hoisington*, 104 Idaho at 162, 657 P.2d at 26. Reliability is the linchpin in determining the admissibility of in-court and out-of-court identifications. *Hoisington*, 104 Idaho at 161, 657 P.2d at 25. Factors to review in determining whether an identification is reliable include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of his or her prior description of the criminal; (4) the level of certainty demonstrated at the identification; and (5) the length of time between the crime and the identification. *Id.*

■ A lineup may be considered unduly suggestive if a witness's attention is focused on the defendant. *State v. Hyde*, 127 Idaho 140, 146, 898 P.2d 71, 77 (Ct.App.1995). Single subject showups; multiple lineups, with the same individual recurring; and showing a witness a lineup in the presence of another witness increases the suggestiveness of the lineup. *See Hoisington*, 104 Idaho at 162, 657 P.2d at 26; *Hyde*, 127 Idaho at 146–47, 898 P.2d at 77–78. The danger of misidentification is also increased when a photo is

placed in a spread in such a manner that the witness's attention is drawn to it because of the size, color, placement, or other distinguishing mark. *Hyde,* 127 Idaho at 146, 898 P.2d at 77.

 Gray contends that the photo lineup displayed to Mackley was flawed. Mackley knew the individual in photo six and was therefore shown, in essence, a five-photo lineup. Gray argues that because his picture bore a pink tint while the others carried a green or white tint, Mackley's attention was drawn to Gray's photo. He further argues that only he and one of the other four individuals unknown to Mackley wore glasses and that the other individual's glasses were sunglasses while his were reading glasses. Gray argues that this difference is important because in his statement to the police Mackley reported that the individual he saw in the hospital parking lot on the evening of the murders looked over his glasses while speaking to him. Gray further argues that he was the only individual in the photo lineup smiling.

The district court, in reviewing Gray's arguments regarding the lineup, determined that the lineup was not impermissibly suggestive. The district court found:

> In the present case, two of the men in the photographs appear to be the same age as Gray, and the rest appear to be no more than ten to fifteen years younger. All of the men in the photographs have receding hairlines, and four out of the six have facial hair. In addition, every person photographed appears to be the same race. Further, three of the persons pictured have grayish dark hair like Gray's. Therefore, even though Gray and the person in photograph six are the only ones who are wearing reading glasses and smiling, it cannot be said that the members of the photo lineup differ dramatically from one another.

 The use of only five photos in a lineup is not necessarily suggestive. *Hyde,* 127 Idaho at 146, 898 P.2d at 77. Therefore a lineup of six photos, one of which contained a known individual, would not, alone, indicate that the lineup was suggestive. Similarly, difference in size and color composition of the

photographs in and of themselves do not render an array unnecessarily suggestive. *Id.* Mackley reported seeing a man who looked over his glasses and was red in the face, and only Gray's photo showed a ruddy complexion and reading glasses. Gray's photo was also of a different color composition than the remaining pictures in the line-up. These three factors together, create an indicia of suggestiveness. Therefore, under the circumstances, we will review the reliability of Mackley's identification of Gray.

 The first factor to consider in determining the reliability of Mackley's identification is his opportunity to view Gray. Mackley testified that the lighting in the parking lot was dim, that he had a flashlight but did not shine the light directly in the man's face and that the man never looked directly at Mackley during the conversation. However, Mackley also testified that he and the man held a conversation of some length. Their discussion included who the man was, whose vehicle it was and where the man was going.

The degree of the witness's attention is the second factor. Mackley was working as a security guard at the time he saw the man in the parking lot. He viewed the man as an intruder and a possible danger to the hospital or cars parked there. Mackley, therefore, was an attentive observer. The third factor is the accuracy of Mackley's description. Mackley's description of the man he saw in the parking lot was, on a whole, accurate, but for the fact that Mackley did not report any facial hair. As the district court noted, in light of Mackley's failure to describe the man as one with facial hair, his description, as compared to Gray's appearance, was only fairly accurate. The fourth factor in determining the reliability of Mackley's identification is the level of certainty regarding the identification. Mackley was quite certain that the photograph of Gray was that of the man with whom he talked in the parking lot of the hospital. The fifth factor is the time span between the observation and the identification. Here, that time period was three days, which does not detract from the reliability of the identification.

Applying the five-factor test, Mackley's identification of Gray was sufficiently reliable to outweigh the low level of suggestiveness in the identification procedures. Therefore, its admission was not error and it did not taint the later identifications made by Mackley.

## D. Lay Opinion Testimony

### 1. Admission of lay opinion

Gray contends that the district court erred in admitting the testimony of four lay witnesses regarding their opinion that Gray murdered Betty and Roundy. The state argues, first, that any error in this regard was not preserved on appeal by timely objection at trial. The state further argues that the opinions of the witnesses were not offered to prove Gray's guilt but, rather, were offered to explain certain relevant actions by the witnesses themselves.

 Gray acknowledges that his counsel did not object at trial to the statements which he now contends were admitted in error. As a general rule, in the absence of a timely objection to an alleged error at trial, the error will not be reviewed on appeal. *State v. Sharp*, 101 Idaho 498, 503, 616 P.2d 1034, 1039 (1980). A fundamental error may be reviewed on appeal even absent a timely objection. *State v. Lewis*, 126 Idaho 282, 284, 882 P.2d 449, 451 (Ct.App.1994). However, any error in admitting testimony is not fundamental error where the evidence does not go to the foundation of the case or take from the defendant a right which was essential to the defense. *State v. Higgins*, 122 Idaho 590, 596, 836 P.2d 536, 542 (1992); *Lewis*, 126 Idaho at 284, 882 P.2d at 451. We decline to decide whether the improper admission of lay opinion testimony may be fundamental error, reviewable on appeal in the absence of a proper objection. *See State v. Higgins*, 122 Idaho 590, 596, 836 P.2d 536, 542 (1992); *but cf. State v. Walters*, 120 Idaho 46, 813 P.2d 857 (1990). Because we have determined that there was no reversible error in this case, whether the matter is properly preserved for appeal need not be addressed.

 Gray claims that the inadmissible opinion testimony was presented by four witnesses: Jeff Gray, Sara Hoffman, Detective Rodriguez and Kim Gray. Prior to testimony by any witness, defense counsel presented his opening statement. In the opening statement he alluded to a financial motivation for Gray's children to give damaging testimony:

You'll hear a lot about the civil lawsuit. The civil lawsuit was a lawsuit in which the children sought to get the insurance proceeds on their mother's policies and other properties.

There was a lawsuit for more than a half a million dollars. The money was on the table and you will hear a lot about that case.

. . . .

Finally in the fall of 1990, more than a year after these murders, Sara Hoffman decided to take matters in her own hands. She will testify that she was dissatisfied with the fact that her father has not been charged with these murders. She was prodded by her aunt, JoAnn Buccola.

JoAnn never really cared for Bill, and so Sara sought the advice of legal counsel. On December 18th, 1990 she hired—or prior to that she hired [an attorney].

. . . .

The suit was initiated at a time when Sara Hoffman had her second child and was living in a trailer home. The suit was initiated at a time when Jeff was in school, had student loans, and was anticipating going into private practice upon his graduation. They sued when there was money on the table.

In answer to the defense's theory of the case, already clear from opening statements, the prosecution sought to identify Jeff Gray's motivation for testifying at trial. During direct examination of Jeff, the prosecution explained this line of questioning, which Gray now claims was error, saying, "It's been suggested in this courtroom maybe three hours ago, that you were only in it for the money because of your student loans," and "Your motives have been discussed a little bit for filing the suit." Hence, evidence of Jeff's opinion was admissible as evidence of his motivation for testifying and credibility at trial.

During cross-examination, defense counsel asked Jeff about his financial situation, the insurance proceeds from his mother's death, the civil lawsuit and the lawsuit's eventual settlement. When Sara Hoffman, the Grays' daughter, took the witness stand, the children's motivation for testifying was even more at issue than during Jeff's direct testimony. Sara provided testimony similar to that of her brother regarding her rationale for testifying against her father. The above analysis applies to Sara's testimony as well, and, thus, her testimony was admissible.

In the direct examination of Kim Gray, the Grays' daughter-in-law, she testified that after she viewed Betty's body, Gray did not ask about its condition. Kim concluded that Gray had already seen the body. Gray contends that this testimony implies Kim's opinion that Gray was guilty. The testimony by Detective Rodriguez, which Gray now challenges on appeal, was elicited by defense counsel during cross-examination and indicated Rodriguez's belief that Gray was involved.[5]

▮ The jury properly heard the opinion evidence by Gray's children admitted for the purposes of showing their motivation for testifying and establishing credibility. We need not determine whether the testimony by Rodriguez and Kim was inadmissible. Any error in its admission was harmless in light of the other, admissible, evidence on the same point already before the jury. Hence, Gray is not entitled to relief on appeal pursuant to this claim.

## 2. Ineffective Assistance of Counsel

Gray argues that trial counsel's failure to object to the lay opinion testimony complained of above fell below the level of representation required by law and prejudiced him by contributing to his conviction. The state argues that even if the evidence was improp-

erly admitted, the error does not merit relief on appeal.

▮ Although it is well established that ineffective assistance of counsel claims are preferably brought through an application for post-conviction relief, if it is clear from the record that trial counsel was ineffective, the claim may properly be raised on direct appeal. *See State v. Allen,* 123 Idaho 880, 882, 853 P.2d 625, 627 (Ct.App.1993). In order to prove a claim of ineffective assistance of counsel, an appellant must show that the attorney's conduct fell below an objective standard of reasonableness. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984); *Aragon v. State,* 114 Idaho 758, 760, 760 P.2d 1174, 1176 (1988). There is a strong presumption that trial counsel's performance falls within the wide range of professional assistance. *Id.* An appellant must not only show incompetence, but must also show that the deficient conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Ivey v. State,* 123 Idaho 77, 80, 844 P.2d 706, 709 (1992). In order for the appellant to satisfy the second prong of the *Strickland* test, he or she must establish that there is a reasonable probability that the outcome of the trial would have been different but for counsel's unprofessional errors. *Aragon,* 114 Idaho at 761, 760 P.2d at 1177.

▮ Gray argues that his trial counsel should have objected to inadmissible opinion testimony of four witnesses: Detective Rodriguez, Kim Gray, Jeff Gray and Sara Hoffman. Gray contends that these four witnesses testified regarding their opinion of his guilt and that his defense counsel was ineffective in failing to object to the testimony. Gray argues that the testimony in this case was inadmissible lay opinion testimony. *See* I.R.E. 701; *State v. Walters,* 120 Idaho 46, 54–57, 813 P.2d 857, 865–68 (1990).

---

5. Q: BY MR. MULLIGAN: ... all investigation with regard to those two individuals stopped. Isn't that true?

A: Well, no, that's not true. Even though they were a group of suspects at that time, they were eliminated.

However, they have never—they proved where they were, their whereabouts. They had no motive. They didn't have the weapon.

And so, therefore, the only suspect we have, proved by his own actions, included himself and involved himself a little more and more, day by day, was the defendant William Gray.

As noted above, the testimony by Jeff Gray and Sara Hoffman was admissible. If a motion or objection lacked merit and would have been denied, counsel ordinarily would not be deficient for failing to pursue it and concomitantly, the defendant could not have been prejudiced by the want of pursuit. *See Huck v. State,* 124 Idaho 155, 158, 857 P.2d 634, 637 (Ct.App.1993). Counsel was not deficient in failing to object to admissible testimony.

■ The testimony by Detective Rodriguez was elicited by defense counsel during cross-examination. Hence, it was not counsel's failure to object, but rather his active questioning of Rodriguez that led to the statement. Gray has failed to address the area of counsel's conduct which led to the admission of this testimony. Further, the question asked by defense counsel addressed when the investigation focused on Gray. Rodriguez chose to explain the sequence of events and reasons more fully than counsel may have anticipated or desired. However, asking the question was not deficient performance and therefore does not fall outside the wide range of professional conduct.

■ Gray claims that his counsel was ineffective in failing to object to Kim Gray's testimony. The prosecution discussed Kim's viewing and identification of Betty's body and asked Kim whether people had approached her afterward to inquire about the condition of the body. The prosecution then asked Kim who had not done so, to which Kim responded that "actually, I found it very peculiar that [Gray] did not ask me what I had seen until I realized that he knew what I saw." The statement was not responsive to the question and defense counsel had no notice that Kim would make such a statement. Trial counsel "may well have made the tactical decision not to object and move to strike, so as not to draw further attention to the passing reference." *State v. Roles,* 122 Idaho 138, 147, 832, P.2d 311, 320 (Ct. App.1992). We will not second guess defense counsel's decision not to object to the statement after it had been placed before the jury in this situation.

■ Further, in light of the testimony by Gray's children, review of the record indicates that Rodriguez and Kim Gray's testimony did not prejudice the defense and Gray has therefore not established the second prong of *Strickland.* The record on appeal does not establish that absent this testimony the outcome of the trial would have been different. Gray has failed to establish his claim for ineffective assistance of counsel.

## E. Change of Venue

■ A trial court's decision on a motion to change venue is discretionary in nature. *State v. Hall,* 111 Idaho 827, 829, 727 P.2d 1255, 1257 (Ct.App.1986). Error cannot be predicated on the mere existence of pretrial publicity concerning a criminal case. The validity of a court's decision to try a case in a particular venue is tested by whether, in a totality of existing circumstances, juror exposure to pretrial publicity resulted in a trial that was not fundamentally fair. *State v. Hyde,* 127 Idaho 140, 145, 898 P.2d 71, 76 (Ct.App.1995). Factors to consider in determining whether the defendant has received a fair trial, and thus whether denying the motion for change of venue was an abuse of discretion, include: an affidavit indicating a prejudice in the community; testimony at voir dire as to whether any juror had formed an opinion of the defendant's guilt; whether the defendant challenged for cause any of the jurors finally selected; the nature and content of the pretrial publicity; the length of time elapsed between the pretrial publicity and the trial; and any assurance given by the jurors themselves concerning their impartiality. *State v. Jones,* 125 Idaho 477, 484, 873 P.2d 122, 129 (1994); *State v. Needs,* 99 Idaho 883, 890, 591 P.2d 130, 137 (1979).

■ In this case there was pretrial publicity. However, the jury was chosen without significant difficulty. The district court questioned the potential jurors at length during voir dire regarding the effect of pretrial publicity. All jurors eventually selected to hear the case testified during voir dire that they had not formed an opinion regarding Gray's guilt. Gray did not challenge for cause any of the jurors who sat on the case. There were almost four years between the

date of the crime and the beginning of the trial. In light of the totality of the circumstances, the jury's exposure did not lead to fundamental unfairness at trial. Based upon the forgoing, we hold that the district court did not abuse its discretion in denying the motion for a change of venue.

## F. Jury

### 1. Failure to strike juror for cause

■ Gray contends that the district court should have struck prospective juror Burton from the jury panel for cause. Burton indicated on a jury questionnaire that she had formed an opinion regarding Gray's guilt as a result of the information she received from the media. Gray contends that because the district court refused to remove Burton from the jury panel he was forced to use a peremptory challenge.

Gray acknowledges that *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) holds that the Sixth Amendment guarantee of a fair and impartial jury is not violated when a defendant is forced to peremptorily challenge a juror whom the court erred in refusing to dismiss for cause, "so long as the jury that sits is impartial." Gray continues, "on the present facts, Appellant has suffered no violation of his federal Sixth Amendment right to an impartial jury in the absence of a showing that the final jury was not impartial, and he makes no such claim here." Gray seeks a more protective rule from this Court based upon the Idaho Constitution.

■ Having formed or expressed an unqualified opinion or belief that the defendant is guilty, or not guilty, of the offense charged indicates an implied bias and is thereby a basis for challenging a juror for cause. I.C. § 19–2020. A challenge for cause is to be decided upon by the trial court. I.C. §§ 19–2024; –2027. That decision is discretionary in nature. *State v. Grube*, 126 Idaho 377, 385, 883 P.2d 1069, 1077 (1994), *cert. denied*, 514 U.S. 1098, 115 S.Ct. 1828, 131 L.Ed.2d 749 (1995); *State v. Hedger*, 115 Idaho 598, 600–01, 768 P.2d 1331, 1333–34 (1989). Burton's comment on the questionnaire was an expression of an opinion or belief that Gray

was guilty. However, in answer to questions during voir dire Burton specifically indicated that she felt able to set aside her prior beliefs and feelings if chosen as a juror.

The district court listened to and evaluated the juror's responses during voir dire and denied the challenge. *See Grube*, 126 Idaho at 385, 883 P.2d at 1077. Passing juror Burton for cause was not error. We, therefore, need not address whether an error in this regard merits relief, pursuant to the Idaho Constitution, absent a showing that the impaneled jury failed to be impartial.

### 2. Sequestration

■ Gray contends that the district court erred in failing to sequester the jury. A trial court's decision to sequester the jury is reviewed for abuse of discretion. *State v. Hall*, 111 Idaho 827, 831, 727 P.2d 1255, 1259 (Ct. App.1986).

■ The district court issued a gag order prohibiting all involved in the trial from discussing it with the press. The district court also repeatedly admonished the jury not to review any press reports relating to the trial. Further the district court polled the jury regarding publicity viewed during the trial proceedings. In light of the district court's strict admonitions and cautionary measures, the district court did not abuse its discretion in refusing to sequester the jury. *Id.*

### 3. Failure to poll all jurors regarding mid-trial publicity

■ Gray moved for a mistrial on the basis that mid-trial media coverage had occurred which may have prejudiced the jury. Gray argued that a television interview was given by Roundy's son, Clayton, after he testified, despite a gag order imposed by the district court. Further, Gray complained of an article which compared Gray with convicted murderer Paul Ezra Rhoades which was published in a local paper. The newspaper article consisted, primarily, of a contrast between Gray's trial and the earlier trial of Rhoades. The article discussed the differences in the crimes, prosecutions, courtroom attendance and the suspects. The district

802

court did not grant the requested mistrial but questioned the jury members, on the record outside the presence of the attorneys and Gray, regarding the mid-trial publicity. Based on these interviews the court concluded that none of the jurors had observed the press reports and therefore no jury bias had arisen. Gray argues that juror number one was inadvertently not questioned and, thus, Gray's constitutional rights to a fair trial and due process were violated.

 The decision to grant or deny a motion for mistrial is a discretionary one for the trial court. *State v. Atkinson,* 124 Idaho 816, 818, 864 P.2d 654, 656 (Ct.App.1993), *cert. denied* 511 U.S. 1076, 114 S.Ct. 1659, 128 L.Ed.2d 376 (1994). On appeal, however, we do not review whether the trial court reasonably exercised discretion under the circumstances, but rather, whether the event upon which the motion is based constitutes reversible error. *Id., citing State v. Urquhart,* 105 Idaho 92, 95, 665 P.2d 1102, 1105 (Ct.App.1983). We will not disturb the district court's denial of a motion for a mistrial unless the event which precipitated the motion for a mistrial constitutes reversible error, when viewed in the context of the full record. *State v. Brazzell,* 118 Idaho 431, 436, 797 P.2d 139, 144 (Ct.App.1990). A mistrial is required if the misconduct of the jury prejudiced the defendant to the extent that he or she did not receive a fair trial. *United States v. Berry,* 627 F.2d 193, 197 (9th Cir. 1980). Hence, we review whether, in light of the fact that eleven of the twelve jurors and both alternates were questioned regarding publicity, the failure to question one witness denied Gray a fair trial.

The district court determined:

The first issue as to whether the publicity has been so pervasive as to give rise to a presumption of prejudice in this case, I find no basis for that, and I'll deny the motion on that basis.

The district court went on to poll the jury in the interests of fairness. During that polling, thirteen of the fourteen members of jury, including the alternates, testified that they had avoided the publicity which led to Gray's motion. The district court then found that there was no actual prejudice as the jurors had not seen the media coverage of which Gray complained.

 The trial court has broad discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. *Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); *United States v. Noah,* 475 F.2d 688 (9th Cir.1973). Each case must turn on its special facts. *Marshall,* 360 U.S. at 312, 79 S.Ct. at 1172–73; *Noah,* 475 F.2d at 692. A trial court should conduct a voir dire if serious questions of possible prejudice arise. *United States v. Williams,* 809 F.2d 1072, 1091–92 (5th Cir.1987). To determine if such questions exist the court must first look at the whether the news material was innately prejudicial in light of factors such as timing and possible effects on legal defenses. *Id.* The court must also ascertain the likelihood that the publicity has in fact reached the jury by reviewing the prominence of the media coverage and the nature and number of warnings against viewing the coverage. *Id.*

As noted above, the newspaper article was not of a highly prejudicial nature. The discussion of the evidence against Gray was minimal. The article focused, instead, on the relatively low public interest and attendance at Gray's trial. The television interview with Clayton Roundy was recorded shortly after he testified. In that interview, Clayton Roundy indicated that, after viewing the evidence presented at that point, he believed Gray would be convicted and that Gray was the one who actually had committed the murders.

 The district court had admonished the jury regarding the media at least seven times prior to the release of the newspaper article and television news story. It is presumed that the jury follows the instructions of the trial court. *See State v. Boothe,* 103 Idaho 187, 192, 646 P.2d 429, 434 (Ct.App. 1982). The district court repeatedly explained that the jurors should avoid all media reports regarding the trial or underlying crime. Hence, although the television story, and to a lesser degree the newspaper story, were potentially prejudicial, it is unlikely that

the one juror who was not polled opted to violate the district court's repeated admonishments.

Further, the district court took immediate action to discover the extent to which the jury had been prejudiced. Although the record reflects that one juror was inadvertently bypassed in the district court's questioning, the remaining thirteen all had conformed to the district court's numerous instructions to avoid the media coverage of the trial. Gray did not present any evidence, such as a post-trial affidavit of the juror who was not questioned, to support the proposition that the juror had read the article or seen the television report. The frequent warnings by the district court were clearly effective in preventing the jurors polled from viewing media reports of the trial.

This Court agrees with the district court's determination that the newspaper article and television report in this case did not deny Gray a fair trial. As noted, this is particularly true in light of the district court's frequent admonishments which were complied with by the thirteen jurors polled. Hence, it was not an abuse of the district court's discretion to deny the motion for mistrial after its investigatory voir dire of all but one member of the jury.

## G. Sufficiency of the Evidence

■■■■ Gray complains that the evidence at trial was insufficient. The standard of review for a challenge to a judgment of conviction based upon the sufficiency of the evidence was stated by this Court as follows:

Appellate review of the sufficiency of the evidence is limited in scope. A judgment of conviction, entered upon a jury verdict, will not be set aside where there is substantial evidence upon which any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Filson*, 101 Idaho 381, 386, 613 P.2d 938, 943 (1980). "[W]e are precluded from substituting our judgment for that of the jury as to the credibility of witnesses, the weight of the testimony, and the reasonable inferences to be drawn from the evi-

dence." *State v. Campbell*, 104 Idaho 705, 718–19, 662 P.2d 1149, 1162–63 (Ct.App. 1983). Furthermore, we view the evidence in the light most favorable to the respondent. *State v. Fenley*, 103 Idaho 199, 203, 646 P.2d 441, 445 (Ct.App.1982).

*State v. Decker*, 108 Idaho 683, 684, 701 P.2d 303, 304 (Ct.App.1985). *See also State v. Robran*, 119 Idaho 285, 288, 805 P.2d 491, 494 (Ct.App.1991).

Gray premises his argument, in part, on statements made during sentencing wherein the district court expressed lingering doubts about Gray's guilt. We note that the district court was provided three opportunities to grant Gray's motion for a judgment of acquittal. I.C.R. 29. In denying the third of Gray's motions, the district court concluded:

I have given this case a great deal of thought, and it has been a troubling case to me. But, when I apply the rules, as I have just summarized, and conceding that this Court cannot substitute its judgment for that of the jury, it is my view that there was substantial competent evidence to support the convictions found by the jury in this case.

Had this Court been on the jury, I would have perhaps evaluated the evidence differently than other members of the jury. I may have determined the credibility of witnesses differently than the jury did and afforded different weight to the evidence than did the jury in this case and may have drawn different inferences from the evidence, but I can't substitute my judgment for the jury.

We agree with district court in its analysis of this issue. Although this Court may have reached a different conclusion, we are not free to substitute our view for that of the jury. There was substantial, although conflicting, evidence in the record supporting Gray's convictions for first degree murder and first degree burglary.

## H. Cumulative Error Doctrine

■■■■ Gray contends that even if no individual error assigned above is sufficient to merit reversal of his conviction, when compounded together, they merit reversal under

the cumulative error doctrine. The cumulative error doctrine "refers to an accumulation of irregularities, each of which by itself might be harmless, but when aggregated, the errors show the absence of a fair trial, in contravention of the defendant's constitutional right to due process." *State v. Peite*, 122 Idaho 809, 822, 839 P.2d 1223, 1236 (Ct.App. 1992). Although there were irregularities around Gray's trial, they do not singularly or in combination amount to a denial of due process of law.

## I. Delay in the Appeal Process

■ Gray claims that delay in processing his appeal denied him due process of law. No showing of prejudice can be made to support an assignment of error involving a delay in processing an appeal if the appeal lacks merit. *United States v. Tucker*, 8 F.3d 673, 676 (9th Cir.1993); *State v. Gallipeau*, 128 Idaho 1, 3–4, 909 P.2d 619, 621–22 (Ct. App.1994). Hence, Gray's contention in this regard is also meritless.

## J. Cross-Appeal

The state filed a cross-appeal, alleging that the district court erred in sentencing Gray. Specifically, the state contends that the district court erred in relying upon "lingering doubt" of Gray's guilt as a mitigating factor in sentencing. Idaho Code Section 19–2515(c) provides that the death penalty shall not be imposed unless a statutorily identified aggravating factor exists. That statute further provides that, even if an aggravating factor exists, the death penalty is not appropriate if mitigating factors exist which outweigh the aggravating factor.

■ Where the trial court erred in imposing sentence, the case may be remanded for resentencing, even if the error was to the defendant's advantage. *See State v. Lankford*, 127 Idaho 608, 617, 903 P.2d 1305, 1314 (1995), *cert. denied*, — U.S. —, 116 S.Ct. 1370, 134 L.Ed.2d 535 (1996). However, once a life sentence has been imposed double jeopardy bars the imposition of the death penalty. *Lankford*, 127 Idaho at 618 n. 5, 903 P.2d at 1315 n. 5; *Caudill*, 109 Idaho at 229, 706 P.2d at 463. Resentencing, in such situations, will entail only a choice between a fixed or indeterminate prison term. *Lankford*, 127 Idaho at 618 n. 5, 903 P.2d at 1315 n. 5. Accordingly, even if the state prevailed on its cross-appeal, we would be constrained not to vacate the sentence in this case and remand it for further action because the sentence imposed, a determinate life term, is the maximum which could be imposed upon remand. Because we conclude that resentencing Gray to the death penalty would violate the double jeopardy clause in this case, we will not vacate the sentence already imposed even if the trial court erroneously considered an inappropriate mitigating factor. *Caudill*, 109 Idaho at 229, 706 P.2d at 463. Accordingly, we will not address the cross-appeal issue further.

## III.

## CONCLUSION

Certain irregularities existed in Gray's trial. However, they did not singularly or in combination result in the denial of due process. Accordingly we uphold the judgments of conviction. We note that the trial court used lingering doubts of Gray's guilt as a factor in sentencing. Regardless of whether utilizing such a consideration is error, we will not remand for resentencing because of double jeopardy concerns. Hence, the judgments of conviction and sentences are affirmed.

WALTERS, C.J., concurs.

LANSING, J., concurs, except as to section II(A)(1)(c), in which she concurs in the result only.