# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 35827

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | **Boise, September 2011 Term** |
| | ) | |
| **Plaintiff-Respondent,** | ) | **2012 Opinion No. 82** |
| | ) | |
| **v.** | ) | **Filed: May 31, 2012** |
| | ) | |
| **HECTOR B. ALMARAZ, JR.,** | ) | **Stephen W. Kenyon, Clerk** |
| | ) | |
| **Defendant-Appellant.** | ) | |

_____

Appeal from the District Court of the Third Judicial District of the State
of Idaho, Payette County. Hon. Gregory M. Culet, District Judge.

The conviction is affirmed.

Molly J. Huskey, State Appellate Public Defender, Boise, for appellant.
Jason Pintler argued.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, for
respondent. Kenneth Jorgensen argued.

_____

W. JONES, Justice

## I. NATURE OF THE CASE

Hector Almaraz appeals from his conviction for first-degree murder. He appeals based
on several evidentiary grounds, arguing that the district court abused its discretion by admitting
impermissible character evidence that gang members commit crimes and other violent acts and
by admitting improper testimony from a police officer and an expert witness interpreting the
security video from the scene of the crime. Almaraz also argues that the district court erred in
failing to suppress an eyewitness identification due to suggestive procedures, and by precluding
an expert from opining to the suggestiveness of a specific eyewitness' identification. He further
asserts that the cumulative effect of the errors deprived him of a fair trial, warranting this Court
to remand the case to district court for a new trial.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Hector Almaraz and Thomas Salazar, both members of the gang Brown Magic Clique,
("BMC"), attended a bar, Club 7, on April 23, 2006. The bar was equipped with sixteen (16)

1

video surveillance cameras which showed that a fight erupted after Almaraz punched another patron, Gabriel Flores. At approximately 2:19:51 a.m., just thirty seconds after the brawl erupted, the video cameras depict Flores flailing his arms in the air and stumbling to the ground. Although the video does not clearly portray the shooting, or identify any patron with a gun, it does show Almaraz behind Flores just before he was shot. Gabriel Flores died in the hospital as a result of a penetrating gunshot wound to the back. Almaraz was subsequently charged with first-degree murder in the shooting death of Flores.

Prior to trial, the State filed a Motion in Limine seeking to admit evidence of Almaraz' gang affiliation to support its theory of motive at trial under I.R.E. 404(b). The State argued that the shooting was not merely a random killing, but that Almaraz shot Flores because of a gang rivalry. The State asserted that Flores was shot because he was wearing a red jersey which symbolized the color of a rival gang. Almaraz objected to such testimony during the pre-trial hearing and at trial on the ground that its probative value was substantially outweighed by the prejudicial effect. The district court ruled that evidence of Almaraz' gang affiliation was relevant to the issue of motive and after applying a balancing test, the court found that the probative value was not outweighed by the prejudicial effect.

The district court allowed Salazar and another former member of BMC, Armando (Milo) Landin, to testify about the criminality of BMC. Landin testified that BMC's criminal purpose was "basically selling drugs and violence." Salazar testified about Almaraz' membership in BMC, about the general criminal conduct of BMC gang members, and about the events that took place with Almaraz on the night that Flores was killed. Specifically, Salazar testified that the colors blue and brown symbolized membership in BMC and that the color of one of the gang's rivals was red. When recalling the details leading up to the fight, Salazar, who was standing near Almaraz in the bar, testified that Almaraz asked Flores why he was wearing a red shirt and inquired about which gang Flores claimed. Flores explained that he was not representing any gang, but simply liked the jersey.[1] According to Salazar, Almaraz then asked Flores to remove his red shirt. When Flores refused to take off his red jersey, a fight immediately broke out, which ultimately ended when Flores was shot in the back.

The State then presented Officer Jason Cantrell to testify as an expert on gangs. Officer Cantrell testified about the criminality of gangs and the violent crimes generally committed by

---

[1] The red jersey was actually a Chicago Bulls jersey.

2

street gangs.  His testimony was not specifically related to BMC or any of its members.  Almaraz objected to the State calling Officer Cantrell as an expert on "what gang life is like" in general.  After the court allowed Officer Cantrell to give his expert opinion testimony about gangs, the defense moved for a mistrial, or alternatively, to have the entire testimony stricken from the record, arguing that the State failed to prove that BMC was in fact a criminal street gang with the primary purpose to commit crimes.

Ken Hust, the State's key eyewitness who was at the Club 7 bar on the night of the murder, identified Alamaraz as the shooter.  The defense moved to suppress Ken Hust's eyewitness identification because of the alleged overly suggestive procedures used by the police to obtain the identification.  Almaraz argued that Hust's identification was unreliable because of the procedures employed by the police during the interview, because of the group photograph used as the "photographic lineup," and because of the lack of opportunity to adequately observe the shooter at the time of the incident.  The district court ultimately denied Almaraz' Motion to Suppress, finding Hust's pre-trial identification admissible.  The court, however, allowed the defense to present expert testimony from Dr. Daniel Reisberg, a cognitive psychologist, to testify about the types of suggestive procedures that can render an eyewitness identification unreliable.  Nevertheless, the court limited the scope of his testimony to preclude Dr. Reisberg from testifying about the suggestiveness of the specific procedures used during the police interview with Hust.

The State called Lieutenant Stephanie Steele, an officer who was called to duty on the night of the shooting, to review the bar's surveillance video tapes.  The defense objected to Lieutenant Steele's characterization of the video when she testified, on re-direct examination, that Almaraz appeared to be in what she called a "shooter's crouch" just before Flores was shot.  The defense argued that such an interpretation invaded the province of the jury.

The State also called Grant Fredericks to testify as a video expert to assist the jury in accurately interpreting the bar's surveillance videos from the night of the murder.  When testifying to his impression of optimized versions of the surveillance videos, the State asked Mr. Fredericks if he had formed an opinion about when Flores was shot.  The defense objected, arguing that Mr. Fredericks' background in analyzing hundreds of videos was not a sufficient foundation to testify about a person's physiological reaction to being shot.  The defense further argued that the question went to the ultimate issue of the case and thereby invaded the province

3

of the jury. The district court allowed Fredericks to give his opinion about the particular video frame that depicted the victim's response to being shot.

The jury returned a verdict finding Hector Almaraz guilty of first degree murder. On September 26, 2008, Almaraz was sentenced to life imprisonment with forty (40) years fixed. Almaraz filed a Motion for a New Trial which was subsequently denied by the district court. Almaraz timely filed a Notice of Appeal against his conviction and sentence on October 31, 2008.

## III. ISSUES ON APPEAL

1.  Whether the district court abused its discretion by allowing the jury to hear character evidence regarding the criminality of BMC and by allowing the jury to hear the expert opinion testimony of Officer Cantrell, asserting that gang members generally commit crimes and violent acts?

2.  Whether the district court erred in failing to suppress Ken Hust's eyewitness identification as unnecessarily suggestive and unreliable due to pre-trial procedures that were used by the police?

3.  Whether the district court abused its discretion by preventing defense expert, Dr. Reisberg, from testifying about the specific procedures used by the police during Ken Hust's eyewitness identification?

4.  Whether the district court abused its discretion by allowing Lieutenant Steele's testimony interpreting the surveillance video and opining that Almaraz was standing in a "shooter's crouch" just before Flores was shot?

5.  Whether the district court abused its discretion in finding the State had laid a proper foundation to support admitting the testimony of Grant Fredericks, a video expert, regarding the precise moment Flores was shot?

6.  Whether the accumulation of errors in the trial deprived Almaraz of a fair trial?

7.  Whether the district court abused its discretion by denying Almaraz' Motion for a New Trial?

## IV. STANDARD OF REVIEW

This Court generally reviews a trial court's decision to admit evidence under an abuse of discretion standard. *State v. Grist*, 147 Idaho 49, 51, 205 P.3d 1185, 1187 (2009) (citing *State v. Robinett*, 141 Idaho 110, 112, 106 P.3d 436, 438 (2005)). When reviewing the lower court's discretionary decision, this Court must conduct a three-part inquiry to examine "(1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the court reached its decision by an exercise of reason." *State*

4

*v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989) (quoting *Assocs. Nw. Inc., v. Beets*, 112 Idaho 603, 605, 733 P.2d 824, 826 (Ct. App. 1987)).

V. Analysis

**A.      The District Court Did Not Abuse Its Discretion by Admitting Evidence About the Criminality of Gangs**

The State filed a Motion in Limine seeking to introduce evidence of Almaraz' gang affiliation for the purpose of proving motive. To support its theory that Almaraz shot Flores because of a gang rivalry, the State sought to introduce the expert testimony of Officer Cantrell regarding the violent nature of criminal gangs in general, as well as the testimony of former BMC gang members regarding the criminal nature of BMC specifically. The defense objected to the State's offer of proof, arguing that evidence of gang affiliation would be unfairly prejudicial. The district court ultimately allowed the testimony of two former BMC gang members, Salazar and Landin, and the expert testimony of Officer Cantrell, ruling that such evidence was relevant to prove motive under I.R.E. 404(b). After balancing the probative value of such testimony against the danger of unfair prejudice, the court found that the probative value of the gang-related evidence proving motive was not substantially outweighed by the unfair prejudice associated with being a member of a gang and admitted the State's proffered testimony.

*1.      Almaraz' Claims Were Properly Preserved for Appellate Review*

On appeal, Almaraz concedes that evidence of his affiliation with the BMC gang was properly admitted by the district court. Moreover, Almaraz does not challenge the admission of evidence that the color blue is associated with BMC, while the color red is associated with its rival gang, or that Flores was wearing a red jersey the night he was shot. Neither does Almaraz contest the fact that he asked Flores to take off the red shirt which led to a fight after Flores refused to remove his shirt. On appeal, Almaraz objects solely to the testimony regarding the criminal conduct of BMC members and of street gangs in general as impermissible character evidence. The State argues that because Almaraz did not specifically invoke I.R.E. 404 as grounds for the objection at trial, Almaraz' claims are not preserved for appellate review.

In order for an issue to be properly preserved for appellate review, the ground for the objection must be clearly and specifically stated in a timely manner. *State v. Norton*, 134 Idaho 875, 880, 11 P.3d 494, 499 (Ct. App. 2000). However, some discretion lies with the court to consider the objection in light of the context in which it was presented. Under I.R.E. 103(a), an objection must state "the specific ground of objection, if the specific ground was not apparent

5

from the context." After reviewing the objection in light of the record and the transcripts, it becomes clear that the context of the objection to the evidence in question was always related to the character evidence rule under I.R.E. 404(b).

In the State's initial Motion in Limine, the State argued that evidence of Almaraz' gang affiliation was relevant and admissible under I.R.E. 404(b) as character evidence used for non-propensity purposes, such as motive. Furthermore, when the defense objected to the State's proffer of testimony from Salazar and Landin as unduly prejudicial, the court evaluated the merits of the defense's argument in light of the relevant rules at play. The district court began its analysis with I.R.E. 401 and I.R.E. 402 regarding relevance in general. Next, the court acknowledged that the relevant rule in question was I.R.E. 404(b) and read the language of the rule. The court then posed the question: "[s]o is the evidence relevant to a material issue other than propensity in this case?" Finally, the court discussed that I.R.E. 403 necessitates the court conducting a balancing test.

Based on the fact that the State presented the testimony regarding the criminal activity of BMC under the guise of I.R.E. 404(b), arguing the evidence was relevant to Almaraz' motive, the defense's objection did not need to specifically invoke I.R.E. 404(b). This conclusion is further supported by the fact that the court articulated its ruling on the defense's objection in reference to I.R.E. 404(b). It is apparent from the context of the transcripts that the defense objected to the testimony as unfairly prejudicial because of a fear that prior bad acts or wrongs associated with gang activity would be used for propensity purposes which would substantially outweigh any probative value.

Contrary to the State's argument, the record shows that the defense grounded its objection to the expert testimony of Officer Cantrell under I.R.E. 404(b). Furthermore, it is clear from the defense's argument that the objection to Officer Cantrell's testimony about gang life was made out of a concern that the evidence would in fact be used for propensity purposes. In explaining his argument, the defense attorney stated "[w]e're going to get into all this evidence that talks propensity and bad character . . . ."

At trial, the defense went on to read the language of I.R.E. 404 subsections (a) and (b) to the court and stated:

> But if we get into gang evidence as to establish an alleged motive of Hector
> Almaraz, we're going to hear about all about the types of horrible things gangs
> do. And the method of proof that they're arguing here, the method of proof is

6

because gangs do these things, then, therefore, ergo, a gang member would have a propensity to do these things. . . . And we have nothing that ties [Almaraz] to any of these actions. So allowing that in is nothing but prejudicial.

Based on the context, this Court finds that it was not necessary for the defense to specifically invoke I.R.E. 404(b) in its objections to preserve the issue for appellate review because the grounds are apparent from the defense's arguments.

> 2.      *There Was No Abuse of Discretion in Allowing Salazar and Landin to Testify to the Criminal Conduct of BMC.*

Generally, character evidence is not permissible to prove the person acted in conformity therewith. I.R.E. 404(a). Furthermore, evidence of other crimes, wrongs, or acts is also not admissible to prove criminal propensity. *State v. Grist*, 147 Idaho 49, 52, 205 P.3d 1185, 1188 (2009); *see* I.R.E. 404(b). However, evidence of other crimes, wrongs, or prior acts may be admissible if offered to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." I.R.E. 404(b). The admissibility of prior bad acts is subject to a two-pronged analysis. *State v. Field*, 144 Idaho 559, 569, 165 P.3d 273, 283 (2007) (citing *State v. Moore*, 120 Idaho 743, 745, 819 P.2d. 1143, 1145 (1991)). First, the court must determine whether the prior wrong or bad act is relevant to a material issue other than the defendant's character or propensity for the crime charged. *Id.* Second, the court must perform a balancing test to determine whether the probative value of the bad act is substantially outweighed by the danger of unfair prejudice. *Id.*; *see also* I.R.E. 403. The trial court's determination regarding the danger of unfair prejudice is discretionary and will not be disturbed on appeal unless it is shown to be an abuse of discretion. *Id.*; *State v. Enno*, 119 Idaho 392, 406, 807 P.2d 610, 624 (1991).

The district court correctly admitted the testimony of Salazar and Landin to support the State's theory that Almaraz was motivated to kill Flores because of a gang rivalry. On appeal, it is undisputed that evidence of Almaraz' membership in the BMC gang was properly admitted under I.R.E. 404(b) to demonstrate motive. This Court further finds that the testimony from Salazar and Landin regarding the criminal and violent conduct of BMC members was also properly admitted. Such evidence is relevant to explain how gang rivalries can often lead to violence and retaliation. Salazar and Landin provided specific examples of prior crimes that members of BMC had committed in the past. The defense argues that such evidence of prior bad acts is improper character evidence under I.R.E. 404(b) because the testimony is about other

7

members' bad acts and is not specifically related to Hector Almaraz. The fact that the conduct was not related to Almaraz shows it was not offered to prove his character but only to prove motive. The defense is correct that such testimony of bad acts committed by other people is not admissible under I.R.E. 404(b). Nevertheless, such testimony is relevant under I.R.E. 401 and I.R.E. 402 and the district court properly held that the testimony of BMC's history of gang violence was relevant to illustrate how something as simple as wearing a red shirt could trigger a rival gang member to react with violence if he felt disrespected. The Court finds that this evidence is relevant to an issue other than Almaraz' criminal propensity for murder; it is relevant to illustrate motive and intent.

3. *The District Court Did Not Abuse Its Discretion by Admitting the Expert Testimony of Officer Cantrell*

Officer Cantrell, the State's expert on gang activity, testified that gangs carry out violent and criminal activities regularly. Officer Cantrell also testified that different gangs wear different colors and that a rival gang wearing a rival color may incite violence. Officer Cantrell had no prior knowledge of the BMC gang and none of the testimony was specific to BMC. Therefore, the defense argued that the testimony was irrelevant and highly prejudicial character evidence under I.R.E. 404(a). Almaraz argues that by allowing Officer Cantrell to testify that gangs generally commit crimes, the jury would infer that Almaraz was more likely to commit a crime because he is a gang member. Officer Cantrell's testimony is relevant to motive because it explains how criminal gangs operate and assists the jury in understanding the nature of gang rivalries. Thus, the Court finds that the district court did not abuse its discretion by admitting Officer Cantrell's testimony about gang culture.

4. *The Probative Value of the Evidence Relating to the Gang Activity of BMC and the Criminal Conduct of Street Gangs in General Was Not Substantially Outweighed by Unfair Prejudice.*

The district court recognized the potentially inflammatory nature of gang evidence and balanced the probative value of the testimony against the danger of unfair prejudice in accordance with I.R.E. 403. The court found that the probative value of the testimony was not substantially outweighed by the prejudicial effect of the testimony. To further mitigate any unfair prejudice of gang related testimony, the district court gave a limiting instruction to prevent the jury from considering the evidence as probative of Almaraz' propensity to commit crimes. The district court instructed the jury that "[s]uch evidence may be considered by you only for the

8

limited purpose of proving the defendant's motive. . . . You should disregard such evidence if you find no connection between the crime charged and gang involvement."[2] The testimony challenged is relevant in understanding Almaraz' purported motive to shoot Flores because of a seemingly harmless offense, wearing a red jersey in the wrong place. Such evidence of gang culture was necessary to explain how the mere gesture of refusing to remove a shirt amounted to an act of disrespect which could provoke a violent and deadly reaction. Therefore, this Court finds that the district court did not abuse its discretion in determining that the probative value of the evidence relating to BMC's criminal activity and the violent nature of street gangs was not substantially outweighed by unfair prejudice.

## B.     The District Court Erred in Failing to Suppress Ken Hust's Identification of Almaraz as the Shooter

Ken Hust was a patron at the Club 7 bar on the night of the shooting. At first, Hust told police officers that he did not see the shooter. The police officer who conducted the interview with Hust, Officer Sloan, testified that Hust initially appeared very apprehensive and reluctant to speak with him. In an effort to calm Hust's fears and encourage him to talk, Officer Sloan told Hust "we caught the guy that did the shooting." Hust then explained that he might be able to recognize the shooter if he saw his face. Officer Sloan left the interview room to retrieve a photo to be used in the photographic lineup and turned off the tape recorder. Officer Sloan testified that upon returning with the photograph, Hust's face went blank as if he had seen a ghost and identified Almaraz without hesitation. The photograph obtained by Officer Sloan and presented to Hust was not a typical photo lineup. Instead of several distinct pictures of different individuals, the photo used was a group photograph of Almaraz and seven other Hispanic men, one of whom was holding a small child. Almaraz was in the center of the photo with a chandelier hanging directly above his head.

The defense moved to suppress Hust's pre-trial identification and any in-court identification of Almaraz as the shooter, arguing that the procedures used by the police were overly suggestive, rendering the identification unreliable. In support of its motion, the defense presented testimony from Dr. Reisberg, an expert on cognition and memory. During the pre-trial hearing, Dr. Reisberg identified several procedures used by Officer Sloan to be suggestive such

---

[2] In addition to giving jury instructions at the close of the trial, the court also gave the jury a limiting instruction regarding all expert testimony presented, explaining that the experts are there to assist the jurors in weighing the information, but ultimately the determination is up to the jurors as the triers of fact.

as interrupting the witness, asking leading questions, providing the witness with outside information, and pressuring the witness to make an identification. For instance, Officer Sloan told the witness "[w]e got a real good case. We got a rock solid case." Furthermore, Dr. Reisberg testified that because the tape recorder was turned off before Hust pointed out Almaraz as the shooter, there is no way of knowing what question was asked when the photograph was presented. Based on Officer Sloan's police report and Hust's written statement after identifying Almaraz, there is no mention that Officer Sloan used the general admonition that the suspect may or may not be in this photo, which is typically included in the reports when used. Instead, Officer Sloan's report states that he asked Hust "who had the gun," which implies the shooter is in the photograph. At the pre-trial hearing on the defense's Motion to Suppress, the defense argued that "even if [Hust] expresses the highest possible level of confidence . . . there's no possibility that that is based on a memory independent of this suggestive interview."

In making its ruling on the Motion to Suppress, the court cited the applicable legal authority and correctly stated that if the identification is a result of suggestive police procedures, then the reliability of the identification must be reviewed under the totality of the circumstances. After the district court considered the circumstances, the court denied the Motion to Suppress, ruling that the identification procedure was not so overly suggestive that it diminished reliability and determined that Hust could testify at trial.

At trial, the State called Hust to describe his interview with Officer Sloan and to testify about identifying Almaraz as the man with the gun. Hust further demonstrated his level of confidence by making an in-court identification of Almaraz as the shooter. The district court allowed extensive cross-examination regarding the pre-trial identification and the suggestive police procedures to attack the reliability of Hust's identifications. For instance, the court allowed Dr. Reisberg to testify before the jury about the different methods of suggestive procedures that can render an eyewitness identification unreliable, without any specific reference to Officer Sloan's interview. Dr. Reisberg was also permitted to testify that the group photograph used by the police, which he described as a "party photo," did not comply with standard police format which usually includes six individual pictures. Dr. Reisberg also testified that the photograph used was inherently suggestive because Almaraz was directly in the center of the photo. Dr. Reisberg explained that the placement of Almaraz surrounded by taller men, coupled with the chandelier hanging above his head, naturally drew attention to the center of the

photograph. He further opined that the photo lineup violated general police guidelines, which typically proscribe any "undue attraction of attention to any one subject in the line-up," by using a picture in which all the men had facial hair except for Almaraz.

On appeal, Almaraz contends that the overly suggestive procedures used by the police to obtain Hust's identification violated his due process rights. In reviewing the district court's denial of the defense's Motion to Suppress, this Court utilizes a bifurcated standard of review. *State v. Bush*, 131 Idaho 22, 28, 951 P.2d 1249, 1255 (1997) (citing *State v. Julian*, 129 Idaho 133, 135, 922 P.2d 1059, 1061 (1996)). This Court will accept the trial court's findings of fact that are supported by substantial evidence and freely review any constitutional principles implicated by the facts. *Id.* Evidence of an out of court identification shall be suppressed if the procedures are so impermissibly suggestive that they create a substantial likelihood of misidentification in violation of the defendant's due process rights. *Neil v. Biggers*, 409 U.S. 188, 198, 93 S. Ct. 375, 381 (1972).

1. *The Suggestive Procedures Used in Obtaining Hust's Pre-Trial Identification Were the Result of Police Action*

The State argues that in order for a constitutional violation to occur, the suggestive procedures must be based on police action. The State argues that the police interview was not suggestive because Officer Sloan was not trying to change Hust's identification, Officer Sloan was merely trying to elicit information that Hust was withholding due to fear of retaliation. The State further claims that any suggestion inherent in the photograph was not a product of police action because the police did not orchestrate the gang posing for the photograph. In support of its argument, the State cites *State v. Payne*, in which this Court held that the witness's identification did not involve state action creating a risk of misidentification. 146 Idaho 548, 562, 199 P.3d 123, 137 (2008). The State's reliance on *Payne* is misplaced because the facts of *Payne* and the facts at hand are completely different. In *Payne*, the witness contacted the police after seeing the defendant's photo on television. Given these circumstances, the police did not need to present a photo lineup. Instead, the police simply used the same photo of the defendant to verify the witness's prior identification. The defendant argued that the photograph was suggestive because the witness had already been exposed to his picture. The Court reasoned that the suggestiveness of the prior exposure was not the result of police involvement. The case at bar can be easily distinguished from *Payne* because the act of showing the suggestive photograph

11

instead of a proper photo lineup was a decision made by the police. Without the police action of presenting the group photo for identification, there would be no suggestiveness.

As such, this Court finds the State's arguments to be meritless. Clearly, any police conduct involving the questioning of the witness constitutes state action. The determination of whether the conduct was suggestive lies with the Court and it is not determined by examining the intentions of the interviewing officer. Moreover, although this Court acknowledges that the suggestive nature inherent in the photograph was not created by police action, the fact that the police chose to deviate from its standard practices in creating a proper photo lineup and instead chose to present a group photograph to an eyewitness for identification constituted state action.

The police chose to use a picture that was overly suggestive in nature, violating the standard guidelines for preparing a photo lineup. When asked about the proper procedures used to prepare a photo lineup, Officer Sloan testified that he typically asks the department's secretary for a lineup after giving her the suspect's name. The DMV then provides the photos using other individuals with similar race, weight, and height, within a couple of hours from the request. Officer Sloan then described the photograph presented to Hust as a "picture [of] a group of individuals" and admitted that the photograph lineup was not prepared by the department. Officer Sloan provided no explanation or justification for using the group photograph as the photo lineup for Hust's identification.[3] Furthermore, the police had the ability to arrange a traditional photo lineup, evidenced by the fact that one was prepared for a different eyewitness. The action taken by Officer Sloan in presenting the suggestive group photograph, instead of a photo array with six individual pictures, constituted state action. Thus, this Court will conduct an analysis of whether the State's conduct violated Almaraz' due process rights.

*2. The Admission of Hust's Identification Testimony Violated Almaraz' Due Process Rights*

To determine whether a defendant's due process rights have been violated by a suggestive identification, a two-tiered inquiry must be performed. First, the court must determine whether the identification procedures were overly suggestive. If the police procedures used are found to be overly suggestive, the court must move on to the second inquiry to determine "whether under 'the totality of the circumstances' the identification was reliable even

---

[3] The defense asked "[c]an you explain why you wouldn't have used a photo lineup for that rather than a group picture that you obtained?" Officer Sloan answered "I can't explain that at this time. I mean, the picture was there, and I just showed it to Mr. Hust and went from there."

12

though the [identification] procedure was suggestive." *State v. Hoisington*, 104 Idaho at 162, 657 P.2d at 26 (1983) (quoting *Biggers*, 409 U.S. at 199, 93 S. Ct. at 382). In *Manson*, the Supreme Court of the United States concluded that "reliability is the linchpin in determining the admissibility of identification testimony . . . ." *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 2253 (1977). Under the totality of the circumstances test, the court must consider the following five factors to decide whether the identification is sufficiently reliable: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the prior description of the criminal, (4) the level of certainty demonstrated at the identification, and (5) the length of time between the crime and the identification. *State v. Hoisington*, 104 Idaho 153, 162, 657 P.2d 17, 26 (1983) (citing *Manson*, 432 U.S. at 114, 97 S. Ct. at 2253; *Biggers*, 409 U.S. at 199, 93 S. Ct. at 382). "If there are 'aspects of reliability' evident from an evaluation of those factors which are sufficient to outweigh 'the corrupting effect of the suggestive identification,' then the admission of identification testimony or evidence will not violate due process." *Hoisington*, 104 Idaho at 162, 657 P.2d at 26 (quoting *Manson*, 432 U.S. at 114, 97 S. Ct. at 2253).

Here, the defense made a pre-trial motion to suppress Hust's identification of Almaraz, arguing that the procedures used by Officer Sloan were so suggestive that it created a substantial risk of misidentification, making the identification unreliable. Both parties are entitled to call witnesses at a suppression hearing. At the pre-trial hearing, the defense presented expert testimony from Dr. Reisberg identifying the suggestive tactics used by Officer Sloan in obtaining Hust's pre-trial identification. At this stage, the court allowed Dr. Reisberg to specifically point out the areas of Officer Sloan's recorded interview that were suggestive. The court ultimately found the procedures to be overly suggestive and conducted a further analysis into the reliability of the identification. The district court properly determined whether the identification was outweighed by independent indicia of reliability by analyzing the five factors set forth under *Biggers*. The court concluded, under the totality of the circumstances, that Hust's identification was not so unreliable that it violated Almaraz' due process rights. The court ruled Hust's identification was admissible and allowed the jury to hear the interview with Officer Sloan and see Hust make an in-court identification of Almaraz.

The district court erred in concluding that Hust's identification was admissible. After reviewing the record, this Court is convinced that the police procedures used to obtain Hust's

13

identification were overly suggestive. Officer Sloan repeatedly interrupted the witness, asked leading questions which implied the answer he was looking for, and discussed with Hust outside information about the case, the suspect, and the victim during the interview. Even more troubling is the fact that Officer Sloan turned off the tape recorder before the interview was completed.

Officer Sloan also improperly used a suggestive group photograph as the photo lineup to identify Almaraz. A degree of suggestiveness exists when an officer implies that a suspect's picture is in the photo lineup. *Hampton v. U.S.*, 318 A.2d 598, 601 (1974). When Officer Sloan showed Hust the photograph, he asked Hust, "who had the gun?" Officer Sloan's question was manifestly suggestive. In telling Hust that the shooter was already in custody, and that they had a strong case, Officer Sloan implied that the shooter would be present in any photographic lineup offered for identification. Further, Officer Sloan failed to give Hust the general instruction that the suspect may or may not be in the photo. Finally, any reliability that may have existed in a traditional photo lineup was eviscerated when Hust was shown a group photograph which placed Almaraz squarely in the center of the group. If a photo lineup creates a situation in which the witness's attention is focused on the defendant, the lineup may be unduly suggestive. *State v. Hyde*, 127 Idaho 140, 146, 898 P.2d 71, 77 (Ct. App. 1995) (citing *State v. Haggard*, 119 Idaho 664, 667, 809 P.2d 525, 528 (Ct. App. 1991)).

All of these circumstances created a substantial risk of misidentification, making the procedures unduly suggestive. Thus, the next step is for this Court to evaluate the five factors set forth under the totality of the circumstances test to determine whether any aspects of reliability sufficiently outweigh the suggestive identification. Under the first factor, Hust had ample opportunity to view the shooter at the time of the shooting. Not only was Hust at the bar on the night of the murder, he also testified that he was trying to break up the fight and indicated that he was merely two to three feet away from Almaraz. However, Hust also stated that he did not get a good look at the shooter's face because he was focused on the victim and because the shooter ducked down and ran out of the bar so quickly.

Under the second factor, there is substantial evidence that Hust's attention was compromised due to his intoxication and the chaotic atmosphere of the bar after the fight erupted. Hust testified that he had been drinking heavily the night of the incident.[4] This would

---

[4] Hust recalled drinking approximately six to eight beers and two shots of liquor prior to the shooting.

14

certainly impact Hust's level of awareness and weighs against reliability. In analyzing the third factor, Hust's inconsistent prior description of the shooter weighs against the accuracy of his later identification. Hust initially described the shooter as a Hispanic male of average weight and height and provided an incorrect description of what the shooter was wearing. Even so, this factor is of little significance in determining reliability. Even the defense's expert, Dr. Reisberg, stated that "scientific evidence suggests that accuracy of description is not a wonderful indicator of whether a memory is right or not." Furthermore, in *State v. Gray*, the court found that an inaccurate description of the suspect did not preclude a later identification from being reliable. 129 Idaho 784, 797, 932 P.2d 907, 920 (Ct. App. 1997.)

Under the fourth factor, this Court must weigh the level of certainty demonstrated by the witness at trial when testifying about his identification and when making his in-court identification of the defendant. At trial, Hust began his testimony by explaining that he was at the Club 7 bar on the night of the shooting and recalled seeing a fight break out. Hust then identified himself in the surveillance video and continuously pointed out his location as the fight progressed. He also testified that he saw a flash in front of him and turned his attention to the shooter. Hust stated:

> I started following the guy that the flash came from towards the front door. . . . It appeared to me like he was putting a dark-colored – like a blue-colored, black semi-automatic gun into his waist, pants, as he was headed past the first pool table as you walk in the front door.

Hust also explained his initial apprehension to speak with Officer Sloan was due to fear. He admitted that he did not originally tell the police that he had seen someone with a gun. However, once he was no longer concerned about his own safety, he was able to identify Almaraz as the shooter. The following is an excerpt which includes Hust's in-court identification of Almaraz as the shooter:

> Q: And what did Officer Sloan want?
>
> A: He wanted me to settle down and explain to him what I exactly seen [sic], and that I'd be safe, and my parents would be safe.
>
> Q: Is that when you decided to share the information with him about the gun, then?
>
> A: Yes.
>
> Q: You told Officer Sloan that you could identify the individual you saw with the gun?

15

A: Yes.

Q: And you did that; is that right?

A: Yes.

Q: Is the man that you believed was holding the gun on the night of the shooting or was putting the gun in his waist belt, I guess is what – was your testimony, is he present in the courtroom today?

A: Yes, he is.

Q: Will you point him out for me?

A: He's sitting right there in a tan shirt with a dark-colored tie on.

The Court finds that the level of certainty demonstrated by Hust at trial weighs in favor of the reliability of his pre-trial and in-court identifications. Finally, in analyzing the fifth factor, this Court finds that the length of time between the shooting and the identification was reasonable and did not detract from the overall reliability of the identification. Three days elapsed between the shooting and Hust's identification and courts have found this time period to be acceptable. *See e.g.*, *Gray*, 129 Idaho at 797, 932 P.2d at 920.

After balancing these five factors, as well as the interview and the photographic lineup, this Court finds that the aspects of reliability surrounding the circumstances of Hust's identification are not sufficient to outweigh the tainted impact of the suggestive identification. Thus, the lower court's admission of Hust's identification testimony violated Almaraz' Due Process rights. Therefore, this Court holds that the district court erred in denying the Motion to Suppress and in allowing Hust's identification to be admitted. The consequence of denying the Motion to Suppress was that both Officer Sloan and Hust were permitted to testify about Hust's identification of Almaraz at trial. Had the Motion to Suppress been properly granted, the jury would have never heard about the identification testimony from either Officer Sloan or Hust.

3. *Although the District Court Erred in Admitting Hust's Identification of Almaraz into Evidence, Such Error Was Harmless*

Where a defendant alleges error at trial that he contemporaneously objected to, this Court reviews the error on appeal under the harmless error test. *State v. Perry*, 150 P.3d 209, 222, 245 P.3d 961, 973 (2010). If the Court finds that the district court erred by abusing its discretion in admitting or excluding the evidence, then the Court must declare a belief beyond a reasonable doubt that the error did not affect the outcome of the trial, in order to find that the error was

16

harmless and not reversible. *Id.* at 227–28, 245 P.2d 978. In other words, the error is harmless if the Court finds that the result would be the same without the error. *See id.*

Although the district court erred in failing to suppress Hust's identification, the error was harmless because there was still ample evidence, even without Hust's eyewitness identification, that Almaraz was the shooter. For instance, several other eyewitnesses testified that Almaraz shot Flores, including two patrons of the bar and Salazar, who was at the bar with Almaraz on the night of the crime and fled the scene with Almaraz immediately after the shooting. Salazar testified that Almaraz told Salazar "I got him," emptied the cartridges from the magazine, removed his shirt, wrapped the shirt around the gun, and then threw it over the bushes. Moreover, the State presented physical evidence that tied Almaraz to the murder weapon. The police recovered a gun wrapped in a brown plaid shirt that was found in a yard near the Club 7 bar. Ballistics tests proved that the gun found by the police matched the cartridge casings used during the shooting. Furthermore, forensic testing showed traces of Almaraz' DNA on the brown shirt, which was worn by Almaraz during the night of the murder. Finally, the bar's surveillance video further corroborated the eyewitness' testimony identifying Almaraz as the shooter. Therefore, the error was harmless because this Court is persuaded, beyond a reasonable doubt, that the lower court's error in failing to suppress Hust's identification testimony did not affect the outcome of the trial.

C. **The District Court Abused Its Discretion by Limiting the Expert Testimony of Dr. Reisberg**

The district court allowed the defense to present expert testimony from Dr. Daniel Reisberg, a cognitive psychologist, about the types of suggestive procedures that can render an eyewitness identification unreliable. In his testimony before the jury, Dr. Reisberg identified proper guidelines regarding witness interviews and identified specific types of police conduct that could compromise a witness's memory. The district court had previously allowed Dr. Reisberg to use a transcribed report of Officer Sloan's interview to highlight the specific aspects of the interview which were suggestive during the pre-trial hearing. At trial, the defense again wanted to offer Dr. Reisberg's full testimony on the suggestibility of Officer Sloan's interview with Hust and the photo lineup. Specifically, the defense wanted to play audio portions of Hust's actual interview where Dr. Reisberg could illustrate how the guidelines can be violated. Yet, during the trial, the court did not allow Dr. Reisberg to testify with the same level of specificity as he did during the pre-trial hearing and limited the scope of his testimony to general statements

17

of suggestive police conduct. The district court allowed Dr. Reisberg to testify about the suggestibility of the photo lineup, but ruled that his expert opinion regarding the suggestiveness of the interview would invade the province of the jury. The court found it proper to leave the issue of the accuracy of Hust's identification to the jury and precluded Dr. Reisberg from making any direct connections between improper guidelines and the procedures employed by Officer Sloan during his interview with Hust. Almaraz argues that the district court abused its discretion because Dr. Reisberg's expert opinion testimony would have assisted the jury in understanding how to apply the guidelines to the facts and in determining the proper weight to give Hust's identification. In making its ruling, the district court found that the jury heard extensive testimony regarding the proper nature of police interviews and examples of improper suggestive conduct. It was then up to the jury to determine whether the suggestive procedures rendered Hust's in-court identification unreliable.

> 1.    *The District Court Erred by Limiting Dr. Reisberg from Testifying to the Specific Procedures Associated with Hust's Identification.*

Under I.R.E. 702, an expert witness may provide an opinion "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." However, even if the evidence is admissible, it may be excluded if the probative value is substantially outweighed by "the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." I.R.E. 403. The trial court has discretion in excluding expert testimony on eyewitness identification and the admissibility will not be overturned without an abuse of discretion. *Weeks v. Eastern Idaho Health Servs.*, 143 Idaho 834, 837, 153 P.3d 1180, 1183 (2007). "Expert opinion which is speculative, conclusory, or unsubstantiated by facts in the record is of no assistance to the jury in rendering its verdict and, therefore, is inadmissible as evidence." *Id.* at 838, 153 P.3d at 1184 (citing *Bromley v. Garey*, 132 Idaho 807, 811, 979 P.2d 1165 1169 (1999)). A lower court does not abuse its discretion if the court correctly recognized the issue as one of discretion, acted within the bounds of its discretion, and reached its decision by exercising reason. *State v. Moore*, 131 Idaho 814, 819, 965 P.2d 174, 179 (1998) (citing *Sun Valley Shopping Ctr., Inc. v. Idaho Power Co.*, 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991)).

Here, the district court failed to recognize that it had discretion to allow Dr. Reisberg to testify about the specific procedures used in Hust's interview. In making its ruling, the court

18

excluded the testimony as invading the province of the jury. The district court allowed Dr. Reisberg to testify about the proper guidelines and procedures that should be followed during police interviews and how certain types of conduct can affect one's memory. This Court finds that having Dr. Reisberg go through the audio recording of Officer Sloan's interview with Hust would have been helpful to the average juror's understanding of whether the interview comported with proper police procedures. The court should not overly restrict expert testimony that assists the jury. This Court finds that it would have assisted the jury to allow Dr. Reisberg to point out specific instances of suggestive conduct in Officer Sloan's interview and to explain the nature and significance of certain overly suggestive acts, such as turning off the tape recorder in the middle of a crucial point during the interview. In reaching this holding, the Court still recognizes that an expert cannot opine to the accuracy of the eyewitness identification or the credibility of any witness as those matters are reserved for the jury.

Nevertheless, testimony relating to the proper guidelines for conducting an accurate interview or lineup, whether or not those procedures were followed in the case at hand, and the consequences of non-compliance with those procedures does not invade the province of the jury. This Court finds that the lower court abused its discretion because it failed to recognize that it had the discretion to admit or exclude Dr. Reisberg's testimony after determining whether such testimony would be helpful to jurors. The court erred by simply excluding Dr. Reisberg's testimony on the ground that it would invade the province of the jury. The court should have recognized it had discretion to allow expert testimony regarding eyewitness identification, made a determination of whether such evidence would have assisted the jury under I.R.E. 702, and ruled in accordance with that determination. Therefore, the Court holds that the district court erred in limiting Dr. Reisberg from testifying about the specific instances of suggestive conduct used during Officer Sloan's interview with Hust.

2. *Although the District Court Erred in Limiting Dr. Reisberg's Testimony, Such Error Was Harmless*

Where a defendant alleges error at trial that he contemporaneously objected to, this Court reviews the error on appeal under the harmless error test. *Perry*, 150 P.3d at 222, 245 P.3d at 973 (2010). If the Court finds that the district court erred by abusing its discretion in admitting or excluding the evidence, then the Court must declare a belief beyond a reasonable doubt that the error did not affect the outcome of the trial, in order to find that the error was harmless and

19

not reversible. *Id.* at 227–28, 245 P.2d 978. In other words, the error is harmless if the Court finds that the result would be the same without the error. *See id.*

This Court holds that although the district court abused its discretion by limiting the expert testimony of Dr. Reisberg, the error was harmless. Dr. Reisberg's testimony would have assisted the jury in identifying overly suggestive procedures and in applying them to the interviews presented. Nevertheless, if the district court had allowed Dr. Reisberg to testify to the specific procedures used by Officer Sloan in eliciting Hust's identification, this Court maintains the belief that such testimony would not have changed the ultimate outcome of the case for the same reasons the Court found the admission of Hust's identification to be harmless as set forth above in Part V.B.3. There were several eyewitnesses who identified Almaraz as the shooter, which was corroborated by the bar's video surveillance, and the police presented scientific forensic evidence that linked Almaraz to the murder weapon. Therefore, the error was harmless because this Court is persuaded, beyond a reasonable doubt, that the court's error in limiting Dr. Reisberg's testimony did not affect the outcome of the trial.

**D.    The District Court Did Not Abuse Its Discretion by Allowing Lieutenant Steele to Testify that Almaraz Was in a "Shooter's Crouch" Just Before the Victim Was Shot**

Lieutenant Stephanie Steele was called to duty on the night of the shooting and supervised the investigation. The State called Lieutenant Steele to testify about the investigation and to review the bar's surveillance video tapes. On re-direct examination, the State asked her to describe the information she was relaying at the scene to the other officers and what part of the surveillance video was significant to the investigation. Lieutenant Steele identified a key frame in the video at 2:19:50 where she testified that Almaraz "appears to be in a – what I call a shooter's crouch" just before Flores was shot. The defense argued that such an interpretation invaded the province of the jury and was beyond the scope of cross-examination. The district court ultimately allowed Lieutenant Steele to proceed, reasoning that the testimony was relevant to illustrate what details she was relying on when she relayed the information to the other officers. Nevertheless, the court agreed that the issue was ultimately up to the jury and provided a limiting instruction explaining that the jurors should make their own determination of what the videos showed. Lieutenant Steele continued to testify about her interpretations of the video and identified where the suspect's position was immediately after Flores was shot, and described how he exited the bar. The defense objected on the grounds that it was improper opinion testimony and the court sustained the objection until a foundation was provided.

Later in the trial, the defense called Officer Dean Muchow who also viewed the bar's surveillance videos. When asked on direct examination if there was a question about when exactly the shot occurred, the State objected that such testimony was improper opinion evidence because of a lack of foundation or knowledge. After sustaining the objection, the defense responded by reminding the court "[w]ell judge, over objection you allowed Lieutenant Steele, with absolutely no more foundation, to give her opinion about not only exactly when the shot occurred, but where the shooter was, the shooter's stance. And that's in the record now. And it was over objection." The court responded by acknowledging that Lieutenant Steele's testimony may have been improperly admitted. The court stated "[a]nd I have noted to counsel since then that that was – I didn't say it on record, but that wasn't something that should have been allowed, but it was something in context to something else."

*1. Almaraz' Claims Were Properly Preserved for Appellate Review*

On appeal, the defense argues that the description of Almaraz in a shooter's crouch improperly invaded the province of the jury because it answered the ultimate issue in the case – who shot Gabriel Flores? The defense further contends that Lieutenant Steele's testimony was improper lay opinion testimony under I.R.E. 701 because it was based on specialized knowledge and a proper foundation had not been laid for her to testify as an expert. The State argues that Almaraz did not properly preserve the issue for appellate review because the defense made no reference to I.R.E. 701 as grounds for the objection at trial.

In order for an issue to be properly preserved for appellate review, the ground for the objection must be clearly and specifically stated in a timely manner. *State v. Norton*, 134 Idaho 875, 880, 11 P.3d 494, 499 (Ct. App. 2000). However, some discretion lies with the court to consider the objection in light of the context in which it was presented. Under I.R.E. 103(a), an objection must state "the specific ground of objection, if the specific ground was not apparent from the context." After reviewing the objection within the context of the arguments contained in the transcripts, this Court finds that the issue was properly preserved for appeal. After Lieutenant Steele characterized Almaraz' stance as "what I call a shooter's crouch," the defense objected by stating: "everybody can look at the same video with the same eyes. And ultimately, it's the jury's question. And interpretation's out of line." Moreover, as Lieutenant Steele continued to describe her interpretations of the video, she testified that the man in the shooter's crouch moved after Flores was shot and pointed out his new position on the video. The defense

21

objected stating "that is an opinion and reasonable people watching this, I guarantee you, will disagree with that interpretation." Although the rule was not specifically invoked, the defense's arguments surrounding Lieutenant Steele's testimony show that the defense was concerned that her conclusion was a lay opinion that was not helpful to a clear understanding for the jury and was based on specialized knowledge as a police officer in violation of I.R.E. 701.

2. *The District Court Did Not Abuse Its Discretion by Allowing Lieutenant Steele to Testify that Almaraz Was in What she Called a "Shooter's Crouch."*

The trial court has broad discretion in determining whether to admit testimonial evidence. *State v. Barnes*, 147 Idaho 587, 591, 212 P.3d 1017 (App. Ct. 2009) (citing *State v. Smith*, 117 Idaho 225, 232, 786 P.2d 1127, 1137 (1990)). Furthermore, the decision to admit opinion testimony, whether lay opinion or expert opinion, rests with the discretion of the lower court, while the determination of its weight lies with the jury. *State v. Cutler*, 94 Idaho 295, 299, 486 P.2d 1008, 1013 (1971). Therefore, the decision to admit or deny such evidence will not be disturbed on appeal absent a clear showing of abuse of that discretion. *Id.*

While this Court acknowledges that the admissibility of Lieutenant Steele's statement that Almaraz was in what she calls a "shooter's crouch" may have been a close call, this Court finds that the decision was made within the district court's discretion. Lieutenant Steele testified to her personal observations of the video and simply explained why she thought frame 2:19:50 was a key frame and why the gentleman in the crouched position was a key suspect. The defense failed to show that identifying Almaraz' stance as a "shooter's crouch" was due to specialized knowledge or was a term of art used by the police. Furthermore, the court allowed the defense to re-cross examine Lieutenant Steele based on her statement, but the defense counsel did not take advantage of that opportunity and did not re-cross examine the witness. The district court also provided the jury with a limiting instruction reminding the jury that they are not bound by any witness's testimony about the video. Therefore, this Court finds that Almaraz failed to show that the district court's admission of Lieutenant Steele's testimony was an abuse of discretion.

E. **The District Court Did Not Abuse Its Discretion in Admitting the Expert Opinion Testimony of Grant Fredericks About when the Victim Was Shot**

The State called Grant Fredericks as an expert in forensic video analysis to assist the jury in interpreting enhanced versions of the bar's video surveillance from the night of the murder. During his testimony, the State asked Fredericks if he had formed an opinion about when Flores was shot and if he could identify that frame in the video. The defense objected, arguing that

22

Fredericks' background in analyzing hundreds of videos was not a sufficient foundation to testify about a person's physiological reaction to being shot. The district court found that the State had laid a proper foundation and allowed Fredericks to give his opinion about the particular video frame that depicts the victim's response to being shot.

> 1. *The District Court Correctly Found that the State Laid a Proper Foundation and Did Not Abuse Its Discretion in Allowing Fredericks to Testify as an Expert Under I.R.E. 702*

The admissibility of expert testimony is discretionary with the trial court and a decision will not be disturbed on appeal absent a clear showing of an abuse of discretion. *State v. Glass*, 146 Idaho 77, 82, 190 P.3d 896, 901 (Ct. App. 2008) (citing *State v. Merwin*, 131 Idaho 642, 647, 962 P.2d 1026, 1031 (1998)). Under I.R.E. 702, expert testimony is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Furthermore, whether a sufficient foundation has been laid for the admission of evidence is also within the discretion of the trial court. *State v. Glass*, 146 Idaho 77, 81, 190 P.3d 896, 900 (Ct. App. 2008) (citing *State v. Braendle*, 134 Idaho 173, 176, 997 P.2d 634, 637 (Ct. App. 2000)).

After reviewing the foundation laid by the State, this Court finds no error in the district court's determination that Fredericks was sufficiently qualified to give his expert opinion of when the impact of the shot occurred based on his experience and training in video analysis. Fredericks is a forensic video analyst who, in 1984, started a company assisting law enforcement with video-related investigations. He then became a police officer with the City of Vancouver Police Department in Canada. There, he was the coordinator of the department's forensic video unit. Fredericks also trained other police officers on how to interpret videos throughout the United States and Canada. In 2000, Fredericks was hired by Avid Technology, the main imaging company for law enforcement, as the manager of the forensic video division. He primarily focuses on videos involving homicide, robbery, and kidnapping cases. When asked to describe his role as an expert, Fredericks responded as follows:

> I have examined thousands and thousands of videotapes over the past 25 years specifically for this purpose, to assist the jury and to accurately interpret the video. My experience is that because of my knowledge and skills and experience and my equipment – and I will spend many dozens, if not hundreds, of hours sometimes examining video – I'm able to see things that the average person wouldn't see right away. So I may be able to point out, this is what the camera

23

shows, and then allow you to assess whether you can also see that. My experience is that if I were just to play it, you wouldn't see everything I see. That's – those are the skills I bear, to assist you. So my duty here is to assist you in accurately interpreting what the video's showing, answer any questions, technical questions about why the video looks the way it does, and to assist you following motion and the movement of individuals . . . .

This foundation was bolstered even further when Fredericks testified about his personal experience in the line of duty seeing people shot. In response to the defense's objection, Fredericks clarified his experience and stated that in addition to analyzing videos of homicides, "I've experienced firsthand, as a police officer people being shot. . . . I have been on the scene where my partner shot somebody, and I've experienced hearing shots and seeing somebody react to being shot."

This Court finds that such a foundation allowed the district court to determine that Fredericks was in fact qualified to give his opinion about which frame depicted the victim reacting to being shot. Fredericks was properly qualified to identify the precise moment captured on video based on his knowledge, training, skill and experience in assisting law enforcement agencies in interpreting videos of crime. In explaining the basis for his opinion, Fredericks testified that at 2:19:50 there was no reaction from the victim. Then, at some point between 2:19:50 and 2:19:51, the victim reacted and you could see that reaction in the video by 2:19:51.[5] Fredericks stated "[h]is arms fly up. He moves forward. His chest comes out. His back is arched. Something has caused that – that to occur." Fredericks goes on to describe that within a third of a second, virtually every patron in the bar reacted intensely and quickly. The totality of these reactions led Fredericks to opine that the shot was fired at the moment just before 2:19:51. Prior to this testimony, the district court also gave the jury a limiting instruction that ultimately the factual determinations about what the video depicts is left to the jury and they should weigh all the testimony regarding the video. As a result, this Court finds no error in the district court's determination that such testimony properly assisted the jury in interpreting the video. In sum, Almaraz has failed to show that the district court abused its discretion in finding that the State properly laid a foundation to support Frederick's expert opinion.

F.      **The Cumulative Error Doctrine Does Not Apply**

---

[5] The video surveillance cameras at Club 7 captured three frames per second. Therefore, Fredericks could only identify when Flores was shot within one-third of a second.

Almaraz argues that the alleged errors during trial constitute cumulative error that deprived him of his right to a fair trial. "Under the doctrine of cumulative error, a series of errors, harmless in and of themselves, may in the aggregate show the absence of a fair trial." *Perry*, 150 Idaho at 230, 245 P.3d at 982 (2008). "The presence of errors, however, does not by itself require the reversal of a conviction, since under due process a defendant is entitled to a fair trial, not an error-free trial." *State v. Moore*, 131 Idaho 814, 823, 965 P.2d 174, 183 (1998) (citing *Bruton v. United States*, 391 U.S. 123, 135, 88 S. Ct. 1620, 1627 (1968)). As described above, this Court has found that two harmless errors were committed by the district court. Nevertheless, after analyzing the errors in relation to the totality of the evidence presented at trial, we find that the cumulative effect was not of such magnitude that Almaraz was deprived of a fair trial. Therefore, we find that the cumulative error doctrine does not require reversal of Almaraz' conviction.

**G.      The District Court Did Not Abuse Its Discretion in Denying Almaraz' Motion for a New Trial**

A trial court has wide discretion to determine whether to grant or to deny a criminal defendant's motion for a new trial. *State v. Bolen*, 143 Idaho 437, 439, 146 P.3d 703, 705 (Ct. App. 2006) (citing *State v. Cantu*, 129 Idaho 673, 675, 931 P.2d 1191, 1193 (1997)). Idaho Code section 19-2406 sets forth the permissible grounds for granting a new trial. This Court reviews a denial of a motion for new trial for an abuse of discretion. *State v. Stevens*, 146 Idaho 139, 144, 191 P.3d 217, 222 (2008). "That discretion is not abused unless a new trial is granted for a reason that is not delineated in the code or unless the decision to grant or deny a new trial is contrary to the interest of justice." *Bolen*, 143 Idaho at 439, 146 P.3d at 705 (citing *State v. Gomez*, 126 Idaho 83, 86, 878 P.2d 782, 785 (1994)); *see also* I.R.C. 34.

Almaraz argues that the cumulative effect of the errors committed during trial deprived him of a fair trial. He contends that such errors warranted the court granting his Motion for a New Trial. Although the defense does not specifically state the grounds under Idaho Code section 19-2406 in which Almaraz seeks a new trial, based on the arguments contained in the defense's motion, it is clear that he brought his motion under subsection 5 which directs the court to grant a new trial "[w]hen the court has misdirected the jury in a matter of law, or has erred in the decision of any question of law arising during the course of the trial." I.C. § 19-2406(5). The majority of the errors that Almaraz complains of in his motion are the same evidentiary issues he raised on appeal.

25

This Court finds that two errors existed in the district court's rulings on these evidentiary matters, but that such errors were harmless. In the defendant's memorandum in support of a new trial, Almaraz asserts that he was deprived of his right to a fair trial because of ineffective assistance of counsel and the State's failure to disclose the changed testimony of one of the State's eyewitnesses. These claims are not among the permissible grounds specified under Idaho Code section 19-2406. This Court reviews the denial of a lower court's motion for a new trial under an abuse of discretion standard.[6] In this case, Almaraz has failed to show that the district court abused its discretion in denying him a new trial. Therefore, this Court upholds the lower court's ruling and finds that the district court did not abuse its discretion in denying Almaraz' Motion for a New Trial.

## VI. CONCLUSION

Based on the reasoning above, this Court holds that the district court erred in failing to suppress Hust's identification of Almaraz as the shooter, and abused its discretion by limiting Dr. Reisberg from testifying about the suggestiveness of the specific procedures employed by the police during Hust's interview with Officer Sloan. Nevertheless, the Court finds these two errors to be harmless. This Court further holds that there was no other abuse of discretion committed by the district court on the remaining evidentiary issues raised by Almaraz on appeal and that the Motion for a New Trial was properly denied. Thus, this Court upholds Almaraz' conviction.

Chief Justice BURDICK, Justices EISMANN, J. JONES and HORTON CONCUR.

---

[6] The standard for granting or denying a motion for a new trial in a criminal case differs from the standard in a civil case. In a criminal case, the court is not required to determine that a new trial would produce a different outcome.